J-E03006-15

2016 PA Super 51

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| WANYA ROSSER, | |
| Appellant | No. 3258 EDA 2013 |

Appeal from the Judgment of Sentence June 4, 2013
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0008571-2010

BEFORE: GANTMAN, P.J., BENDER, P.J.E., BOWES, J., PANELLA, J.,
SHOGAN, J., LAZARUS, J., OTT, J., STABILE, J., and JENKINS, J.

OPINION BY JENKINS, J.:                        **FILED FEBRUARY 26, 2016**

Wanya Rosser was charged with raping a 19-year-old woman, S.R., as she walked home in the early morning hours of October 16, 2010. The trial court prohibited defense counsel from cross-examining S.R. as to whether Rosser told her, following the assault: "I can't see you again, we could be friends, but I have a girlfriend."

The principal issue in this direct appeal is whether the trial court abused its discretion and violated Rosser's constitutional right of confrontation by precluding this cross-examination. Rosser has waived this issue, and even if he preserved it for appeal, it is devoid of merit because there is no factual basis in the record that he actually made this statement. For these reasons, and for others articulated below, we affirm Rosser's judgment of sentence.

I.

**Evidence adduced during trial.** The trial court's opinion thoroughly describes the evidence adduced against Rosser:

The instant case arises out of events that occurred in the early morning hours of October 16, 2010, in Cheltenham, Montgomery County, Pennsylvania. That morning, half a block away from her house, [S.R.] was attacked, threatened, and forcibly raped by [Rosser]. She had never met or talked to [Rosser] before he raped her. She did not fight back because, according to her testimony, [Rosser]'s abrupt and forceful attack and threatening statements made her fearful for her life. Because of that fear, she testified that she believed that the only way to survive was to pretend to befriend her attacker rather than attempt to run away and face even more violent consequences. She reported the rape to her family and the police within seconds of being free from [Rosser], and went to the hospital for a sexual assault examination. Police were able to identify and apprehend [Rosser] near [S.R.]'s house shortly after she reported the incident. [Rosser] was subsequently tried and convicted for Rape, Sexual Assault, and related offenses.

At trial, [S.R.] testified that [Rosser], a complete stranger to her, attacked her from behind, threatened and forcibly raped her just half a block away from her house as she walked home from work on the morning of October 16, 2010. At the time, she was nineteen years old, a student at the Community College of Philadelphia, and working late shifts as a preparatory cook in the kitchen of Sugarhouse Casino in Philadelphia. Shortly after midnight that morning, after completing her shift, she began her commute to her house in Cheltenham. She took the Market-Frankford rapid transit line to the Frankford Transportation Center, where she then took the Route 24 bus to Cheltenham.

Video surveillance footage of the Frankford Transportation Center shows [S.R.] alone as she waited for the Route 24 bus between 12:34 a.m. and 12:51 a.m. This video also shows [Rosser] alone waiting at the same bus stop and standing approximately twenty (20) feet away from [S.R.]. [S.R.]

testified that, at the time, she was unaware of [Rosser] and his presence at the same bus stop. She identified him in the footage several months before trial. The only person [S.R.] spoke to on the bus was the bus driver, to whom she said 'hello' and 'good-bye.'

Next, video surveillance footage of a Wawa convenience store shows the Route 24 bus pulling up to the Cheltenham station at 1:05 a.m., where [S.R.] stepped out of the bus alone, and walked across the street to the Wawa. At 1:06 a.m., the footage shows an unaccompanied [S.R.] entering the Wawa, where she checked her bank account balance, and purchased a cup of coffee. At 1:10 a.m., the footage shows [S.R.], still by herself, exiting the store. [S.R.] testified that she never saw nor spoke to [Rosser] at or near the Wawa. She had no knowledge of [Rosser]'s existence or presence in proximity to her that night.

According to [S.R.], it was cold outside when she left the Wawa, and she immediately began the five-to-ten-minute walk to her house on Woodland Avenue. She walked in the middle of the street, where her mother had told her she would be able to see anyone approaching her if she was alone, and where she thought she would be safer.

When she was approximately a quarter of the way down the street where she lived, she heard quick, heavy footsteps behind her. Before she could see who was rushing behind her, she felt someone forcefully grab her head and place a strong and firm arm around her throat. Having just taken a sip of her coffee, [S.R.] choked on the liquid, and was unable to scream. As she tried to cough the coffee out of her mouth, and in her shock, she only managed to exclaim the words, 'My coffee. My coffee.' She heard her attacker repeat, 'Shh, you are being too loud. You are being too loud.'

Standing directly behind her, he lifted and guided her from the street and toward the sidewalk. He then directed her toward a small grassy hill leading to the front entrance steps of Preservation of the Blessed Virgin Mary (BVM) Parish School, where [S.R.]'s family were members of the parish. As they reached the grass, [S.R.] tripped and stumbled forward. She caught herself on the sidewalk with one hand, held her coffee cup with the other hand, and managed to finish coughing up the coffee that was stuck in her throat. She told [Rosser] that she

did not have any money. He continued to hold her by the throat, and guide her up the small hill and across a mulch-covered pathway until they reached a dark, secluded lawn area between the school and an ivy-covered fence.

[S.R.] testified that by sensing the strength and firmness with which he pressed his arm around her throat, she surmised that he was stronger than she, so she decided not to try to fight back for fear of a more violent consequence. She was not sure if he had a weapon. She also felt [Rosser] relax the pressure around her throat as she lessened her resistance and complied with his demands. She felt that she was being overpowered physically and that submitting to his demands was the only way to survive.

In the secluded lawn area next to the school, [Rosser] maintained one hand around her throat, and placed her cup on top of an air conditioner unit sticking out of the building. She repeatedly begged him not to hurt her, and he replied that she was being too loud, and warned her, 'Don't make me hurt you,' and 'Don't scream.' He then reached into the waistband of her pants and underwear and pulled them down to right above her knees. He pressed on her back, and guided her to bend over and get down on all fours on the ground in front of him. [S.R.] continued to beg him not to hurt her, and he replied that he would only hurt her if she made him hurt her. [Rosser] then unzipped his pants, and began to vaginally rape [S.R.] from behind.

As the rape began, [S.R.] repeated her pleas with him not to harm or kill her. She eventually noticed that [Rosser] began to ease up on the amount of pressure he used to hold her. He no longer had his arm around her neck. Instead, he held one of her arms behind her back and he placed one arm over the arm she had planted on the ground. At one point, [Rosser] removed his penis from her vagina and tried to insert it in her anus. She asked him not to do that, and he reinserted his penis in her vagina and continued to vaginally rape her. She continued to beg [Rosser] not to hurt her, and he finally told her, 'I'm not going to hurt you.' [S.R.] then put her pinkie finger up and asked, 'Pinkie swear that you are not going to hurt me.' [Rosser] did so. [S.R.] was determined to gain [Rosser]'s trust so that he would uphold his promise and she could get home safely. She pretended to enjoy the rest of the rape by sitting up and leaning into him. The rape lasted approximately three minutes. When it

was over, and as he gathered himself, he said, 'Maybe I should get your number.' She laughed out loud at the idea that the stranger who just raped her wanted her number.

After they both stood up from the ground, she asked him, 'How do we end this?' He responded that since she was so good, he would let her see his face. [S.R.] turned around to see [Rosser] smiling at her with big eyes. He was wearing a dark hoodie with a brightly-colored collared shirt underneath. She introduced herself as 'Shannon' and he introduced himself as 'Wakim.' [S.R.] testified that she believed it was in her interest to give him truthful identification information. She was afraid that if he somehow tried to verify the information that she would jeopardize any goodwill she believed she had and needed in order to survive. She then asked him if he had used a condom, and he replied that he had not. She asked him if he was 'clean,' and he stated that he was. Finally, she asked him if he would like to walk her home and he replied that he would. She testified that she did not want to run to her house, because '[i]t would look like I am running to call the cops, which I had every intention of doing.' She continued, 'I knew I would get home faster if I tried to just keep my cool as long as I could.'

As [Rosser] walked [S.R.] to her front door, he told her that he followed her from the train because he was cold and she looked warm. She asked him what he would have done if they had not 'become friends,' and he responded, 'I would have put you to sleep.' He then showed her what he meant by putting his index finger up to his throat, turning his head, and closing his eyes.

At the doorstep to [S.R.]'s house, [Rosser] pulled out his phone. [S.R.] took this to mean that he wanted her phone number, so she gave him her real number. [S.R.] still did not know if [Rosser] had a weapon on him, and she believed it was safer to give him her real contact information in case he tried to verify it before she could get in her house. After he recorded her number, he opened his arms to hug her, and she complied. Before he left, he asked, 'We are going to keep this our little secret, right?' to which [S.R.] responded in the affirmative.

Once inside, she locked the door, and peered through the window to see [Rosser] walk up the street. As soon as she saw that [Rosser] was far enough away from the house, and within approximately five seconds of entering the house, she turned

around and revealed to her brother, who was sitting in the living room, that she had just been raped. Her brother immediately instructed her to tell her father, who was sleeping upstairs.

[S.R.] began calling the police as she ran up the stairs to wake up her father. The time was 1:28 a.m. She frantically informed her father that she had just been raped, and that she was on the phone with the police. While on the phone with the dispatcher, she received a call from an unknown number. [S.R.] rightly concluded that it was [Rosser] calling her. She informed the dispatcher that she believed she now had her rapist's phone number. The police arrived at [S.R.]'s house approximately four minutes after she called the police.

Officer Matthew Hungerford ('Hungerford') took [S.R.]'s statement. At trial, Hungerford, a six-year veteran of the Cheltenham Police Department, took the stand and testified for the Commonwealth. He described [S.R.] as 'very agitated' when he arrived. He stated that her voice was shaky and trembling, but that she was certain of what she was saying. He recalled that she was rattling off information about the incident so quickly that he had to ask her to calm down so that he could record it all. [S.R.] gave Hungerford the telephone number of the unknown caller who called while she was on the phone with the dispatcher, and who [S.R.] correctly guessed to be [Rosser]. Hungerford broadcasted that telephone number to police dispatch.

While Hungerford was taking [S.R.]'s statement, Officer Michael Friend ('Friend') was driving a police vehicle and looking for a male who matched the description of the suspect from police dispatch. At trial, Friend, a seventeen-year veteran of the Cheltenham Police Department, testified that he had received a dispatch report that a sexual assault occurred on Woodland Avenue and proceeded to look for a suspect who was described as a black male, approximately 55, with a short Afro haircut, wearing a black hoodie, brightly-colored shirt, and blue jeans.

Friend testified that, after the flash from the dispatcher informed him that the suspect had gone toward Old Soldier's Road, he drove towards Rising Sun Avenue to look for the suspect. He explained that he proceeded in this direction because there were businesses on that street and it would be easier for someone to blend in with other people. When Friend pulled up to a red light

on Rising Sun Avenue, he observed a male, later identified as [Rosser], who fit the description of the suspect, except that [Rosser] had removed his black hoodie. Friend explained that, through his experience and training, he understood that a suspect may shed clothing in an effort to alter his appearance after a crime. [Rosser] now wore the brightly-colored shirt over a black, long-sleeved shirt, and he was carrying a plastic garbage bag that appeared to be filled with clothing. Friend exited the vehicle, and obtained [Rosser]'s consent to look in the garbage bag. [Rosser]'s black hoodie was not in the bag. At trial, Friend stated that [Rosser]'s hoodie was not discarded in an open area and that police never located it.

After searching the bag, Friend began to take down [Rosser]'s information for the police report that is required whenever police make a pedestrian stop. He called into dispatch with [Rosser]'s information, including his telephone number. That number matched the number that Hungerford had broadcasted to dispatch only six minutes prior. Based on the matching physical description and telephone number of the suspect and [Rosser], Friend placed [Rosser] in handcuffs. Hungerford and [S.R.] arrived at the scene where identification was made, and Friend then transported [Rosser] to the police station.

Hungerford escorted [S.R.] to Abington Memorial Hospital, where Dana Liskova ('Liskova'), a sexual assault nurse examiner ('SANE' nurse), conducted a sexual assault examination of [S.R.]. At trial, Liskova was qualified as an expert in the area of sexual assault forensic examinations. Liskova testified that in addition to examining [S.R.], she reviewed [S.R.]'s medical history and her account of the assault and rape. After relating the facts, knowledge, and experience on which she was relying, Liskova rendered her expert opinion that, within a reasonable degree of medical certainty, [S.R.]'s injuries were consistent with the history that [S.R.] had given her.

At trial, counsel stipulated that [Rosser] and [S.R.] had engaged in sexual intercourse on the morning of October 16, 2010.

Trial Court Opinion, at 2-10 (citations omitted).

**Trial proceedings.** Rosser was charged with rape by forcible compulsion, sexual assault, indecent assault, indecent assault by forcible

compulsion, simple assault, recklessly endangering another person and terroristic threats.[1]

There were two jury trials. The first trial ended in a mistrial when the jury acquitted Rosser of simple assault but could not reach a verdict on the remaining charges.

During Rosser's first trial, defense counsel cross-examined S.R. as follows:

> [Defense counsel]: And [Rosser] told you, I can't see you again, we could be friends, but I have a girlfriend, didn't he?
>
> [S.R.]: Absolutely not.
>
> [Assistant district attorney]: Objection, Your Honor.
>
> The Court: All right. Sustained. That objection is sustained. Strike that question from your deliberations. Okay?

N.T., 4/24/12, at 289-90.

The next morning, the court stated the basis for its decision:

> [I]n order to ask a question on cross-examination that is not in the facts of the case as of yet, you have to make a representation to me if you are going to ask that question that you are going to be able to back it up in your case, present facts that will substantiate or at least for the jury to make a decision whether it substantiates the question. In other words, just to ask any question and throw anything out there that say like, well, aren't you weird or aren't you this or that or haven't you done X, Y, Z, and it has not been introduced as - or in evidence at that point, I'm not going to let you do it, unless you make a

---

[1] 18 Pa.C.S. §§ 3121(a)(1), 3124.1, 3126(a)(1) & (a)(2), 2701(a)(1), 2705 and 2706(a)(1), respectively.

representation that you can deal with it - back it up [in] your case-in-chief.

N.T. 4/25/12, at 5.[2]  Defense counsel did not represent that he could support the factual assertions of his questions with evidence.  Rosser presented no evidence to substantiate his alleged statement to S.R.  Indeed, he elected not to testify or present a defense.  N.T., 4/26/12, at 111-12 (Rosser decides not to testify or present defense).

Before closing argument, defense counsel claimed that he had the right to argue the facts implicit in his question to the jury: "I think I should be permitted to fairly argue, you know, an alternative to the Commonwealth's theory of the case about consensual sex."  N.T., 4/26/12, at 114.  The court responded: "[The Commonwealth] is specifically pointing to some … things that you told me that your client told you.  I'm not going to permit that because there … is no basis for that.  It is not in evidence." *Id*.

_____

[2] The certified record does not include the April 25, 2012 notes of testimony. This quotation appears in the Commonwealth's *en banc* brief.

Rosser, as the appellant, had the duty to ensure that we received the entire record for review, including all necessary transcripts.  *See* Pa.R.A.P. 1911(a); *Commonwealth v. Peifer*, 730 A.2d 489, 492 n.3 (Pa.Super.1999).  When the appellant fails in this task, "we can take such action as we deem appropriate, including dismissal of the issue." *Commonwealth v. Houck*, 102 A.3d 443, 457 (Pa.Super.2014).  In this case, we find that the appropriate action is to accept the quotation in the Commonwealth's brief as accurate.

Prior to Rosser's second trial, the Commonwealth moved *in limine* to preclude defense counsel from questioning S.R. with regard to Rosser's alleged statement. Defense counsel responded:

> [I] think the Commonwealth's position is that [the statement] essentially is hearsay. And I would just suggest to the Court that it is not hearsay because the definition of hearsay is an out-of-court statement offered for the truth of the matter asserted. And that type of question is not any attempt to prove that, in fact, [Rosser] has a girlfriend with a baby,[3] just that [the statement] was said.

N.T., 1/14/13, at 23. The court directed that defense counsel "[cannot] ask her any of those questions, unless you … represent to me [that] you are going to be bringing it into evidence somehow. And I don't think you can represent that to me." *Id*. at 25. Defense counsel answered: "I agree with your Honor. I don't necessarily agree with your ruling. Please note my exception on the record." *Id*. The court precluded defense counsel from asking S.R. whether "[Rosser] during the course of your walk told you that he had a girlfriend and a baby with that girlfriend." *Id*. at 22.

Rosser elected not to testify during his second trial. The jury found him guilty on all charges, including the simple assault charge on which he previously had been acquitted. On June 4, 2013, the trial court sentenced Rosser to an aggregate term of imprisonment of 6½-13 years' imprisonment

---

[3] During the first trial, defense counsel did not ask S.R. whether Rosser stated that he and his girlfriend had a baby. Our analysis below remains the same regardless of this extra detail.

followed by 9 years' probation. Rosser filed timely post-sentence motions challenging, *inter alia*, the weight of the evidence and the legality of his simple assault conviction. In an order docketed on September 6, 2013, the court granted Rosser's motion to vacate his simple assault conviction, resulting in reduction of his probationary sentence to 7 years' probation. The court denied all other post-sentence motions.

On October 8, 2013, Rosser filed a petition for leave to file a direct appeal *nunc pro tunc*, alleging that he never received the September 6, 2013 order deciding his post-sentence motions. The Commonwealth did not object to Rosser's petition. On October 28, 2013, the trial court granted Rosser leave to appeal *nunc pro tunc* within thirty days. On November 27, 2013, Rosser filed a notice of appeal.[4]

**Appellate proceedings.** Rosser filed a timely Pa.R.A.P. 1925(b) statement in which he claimed, for the first time, that the trial court violated his constitutional right of confrontation by granting the Commonwealth's motion *in limine* to preclude defense counsel from cross-examining S.R. about Rosser's statement during the walk to S.R.'s house. Pa.R.A.P. 1925(b) Statement, ¶ 2. On January 24, 2014, the trial court filed a Pa.R.A.P. 1925(a) opinion which defended its decision to grant the

---

[4] Rosser purports to appeal from the trial court's order denying his post-sentence motions, but a direct appeal in a criminal proceeding is from the judgment of sentence. ***Commonwealth v. Preacher***, 827 A.2d 1235, 1236 n.1 (Pa.Super.2003). We have amended the caption accordingly.

Commonwealth's motion on the grounds that (1) Rosser's statement was inadmissible hearsay, and (2) assuming that there was a Confrontation Clause error, such error was harmless due to the strength of the Commonwealth's case against Rosser. Pa.R.A.P. 1925(a) Opinion, at 15-19.

On March 16, 2015, in a 2-1 decision, a panel of this Court vacated Rosser's judgment of sentence and remanded for a new trial. The panel held that Rosser's statement was not hearsay, and that the trial court's decision to preclude cross-examination about Rosser's statement to S.R. violated his constitutional right of confrontation. Notwithstanding the evidence against Rosser, the panel stated, "the questions regarding Rosser's alleged statements about his inability to have a romantic relationship with [S.R.] because of his girlfriend and baby were crucial to Rosser's attempts to call [S.R.'s] credibility with the jury into question." *Commonwealth v. Rosser*, No. 3258 EDA 2013, at 8 (Pa.Super., 3/16/15).

On March 30, 2015, the Commonwealth filed a timely application for reargument *en banc*. The Commonwealth did not contest the panel majority's conclusion that Rosser's alleged statement was not hearsay. Instead, the Commonwealth argued that there was no Confrontation Clause violation because there was no proof that Rosser actually made the statement to S.R. Stated another way, Rosser had no right to cross-examine S.R. on a subject for which no factual foundation existed. On May 20, 2015, this Court granted the Commonwealth's motion for *en banc* review.

- 12 -

II.

In his *en banc* brief, Rosser presents two issues, which we re-order for purposes of disposition:

1. Did the trial court violate [Rosser's] right to confront the witnesses against him as guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution by granting the Commonwealth's objection to defense counsel's attempt to cross-examine the alleged victim regarding her conversation with [Rosser] during the walk to her house[,] as such testimony was aimed at establishing the complainant's motive to fabricate the allegations against [Rosser]?

2. Did the trial court abuse its discretion in denying [Rosser's] post-sentence motion for a new trial insofar as his convictions for rape, sexual assault, indecent assault, indecent assault by forcible compulsion, simple assault, recklessly endangering another person and terroristic threats are manifestly against the weight of the evidence presented at trial?

Brief for Appellant, at 5.

In his first argument, Rosser contends that the trial court violated his constitutional right of confrontation by granting the Commonwealth's motion *in limine* to preclude defense counsel from cross-examining S.R. during Rosser's retrial about whether Rosser said, "I can't see you again, we could be friends, but I have a girlfriend," while they walked home following sexual intercourse.

The Commonwealth contends, and we agree, that Rosser has waived this issue. "One must object to errors, improprieties or irregularities at the earliest possible stage of the criminal ... adjudicatory process to afford the

jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter." *Commonwealth v. Strunk*, 953 A.2d 577, 580 (Pa.Super.2008). "Issues not raised in the [trial] court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). [T]rial judges must be given an opportunity to correct errors at the time they are made." *Id*. at 579. Where the trial court denies relief on one theory, a defendant may not attain appellate relief on a new theory for that same relief. *Commonwealth v. York*, 465 A.2d 1028, 1032 (Pa.Super.1983); *see also Commonwealth v. Lopez*, 57 A.3d 74, 81-82 (Pa.Super.2012) (party complaining on appeal of admission of evidence in trial court is confined to specific objection there made; if counsel states ground for an objection, all other unspecified grounds are waived and cannot be raised for first time on appeal).

During his first trial, Rosser failed to argue that preclusion of cross-examination about his statement to S.R. violated his constitutional right of confrontation. Nor did he raise this issue during his second trial. Rosser merely argued, in response to the Commonwealth's motion *in limine*, that cross-examining S.R. on this subject would not elicit hearsay. The first time Rosser claimed that the trial court violated his right of confrontation was in his Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Because

Rosser cannot switch legal theories on appeal in this manner, **York**, **Lopez**, **supra**, he has waived his constitutional right of confrontation argument.[5]

Even if Rosser preserved this issue for appeal, it is devoid of merit. We review the grant of a motion *in limine* for abuse of discretion. **Commonwealth v. Belani**, 101 A.3d 1156, 1160 (Pa.Super.2014). "A trial court has broad discretion to determine whether evidence is admissible," and a trial court's ruling regarding the admission of evidence "will not be

_____

[5] Although the Commonwealth failed to raise the waiver issue before the original panel in this Court, we may still affirm on the basis of waiver, because "we may uphold a decision of the trial court if there is any proper basis for the result reached." **Nationwide Mut. Ins. Co. v. Fleming**, 924 A.2d 1259, 1269 (Pa.Super.2007).

There is a second reason why the Commonwealth's omission is excusable. When the original panel in this Court reversed the trial court, the Commonwealth, as the original prevailing party, had the right to request *en banc* reargument on issues not previously raised on appeal, including alternative rationales for affirming the trial court's decision, because this was the first time that the Commonwealth was an aggrieved party. **See Sernovitz v. Dershaw**, -- A.3d --, 2015 WL 7283223, *7 n.9 (in wrongful death action, (1) defendants asserted laches-type argument in preliminary objections to amended complaint, (2) trial court sustained preliminary objections and dismissed amended complaint, (3) plaintiff appealed to Superior Court, (4) defendants did not raise laches-type argument before Superior Court panel, (5) panel reversed order dismissing amended complaint, (6) defendants filed application for reargument raising laches-type argument, (7) Superior Court denied reconsideration, and (8) defendants appealed to Supreme Court; Supreme Court held that defendants "have not waived [the laches-type] argument. Defendants forwarded it in briefs supporting their preliminary objections … As the appellees before the Superior Court, they did not bear the burden of issue preservation … Upon becoming aggrieved by the intermediate court's decision, defendants addressed the topic in seeking reargument in that tribunal and discretionary review in this Court …").

disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." ***Commonwealth v. Huggins***, 68 A.3d 962, 966 (Pa.Super.2013). In addition, the trial court has broad discretion regarding "both the scope and permissible limits of cross-examination." ***Commonwealth v. Briggs***, 12 A.3d 291, 335 (Pa.2011). "The trial judge's exercise of judgment in setting those limits will not be reversed in the absence of a clear abuse of that discretion, or an error of law." ***Id***.

The Confrontation Clause in the Sixth Amendment to the United States Constitution provides that all criminal defendants enjoy "the right to confront and cross-examine adverse witnesses." ***Commonwealth v. Laird***, 988 A.2d 618, 630 (Pa.2010). Moreover, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." ***Delaware v. Van Arsdall***, 475 U.S. 673, 678 (1986).[6]

---

[6] The Pennsylvania Constitution includes a right of confrontation. ***See*** Pa. Const., Article I, § 9 ("in all criminal prosecutions the accused hath a right to be heard by himself and his counsel [and] to be confronted with the witnesses against him"). But because Rosser does not argue that Article I, section 9 provides him with greater protection than the Sixth Amendment, we will treat the state and federal provisions as coextensive for purposes of this opinion. ***See Commonwealth v. Kratsas***, 764 A.2d 20, 27 n. 5 (Pa.2001) ("while Appellees have suggested that this Court has the ability to construe Article I, Section 9 more broadly than federal due process, they have offered no particular reasons to support such a departure; therefore, *(Footnote Continued Next Page)*

Although the right of cross-examination is a fundamental right, it is not absolute. The trial court may place reasonable limits on defense counsel's cross-examination of a prosecution witness "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

*Van Arsdall* articulates two inquiries for determining whether a limitation on cross-examination violates the Confrontation Clause. First, we inquire whether the limitation prejudiced the examination of that particular witness. In other words, absent the limitation, would the jury have received a "significantly different impression" of the witness's credibility? *Id*. at 679-80. Second, if there was error, we must determine whether it was harmless beyond a reasonable doubt; if so, reversal is not warranted. *Id*. at 681.

Courts have found violations of the Confrontation Clause when the trial court prohibits defense counsel from cross-examining a prosecution witness *about a verifiable fact* that supports the defense. In *Van Arsdall*, for

*(Footnote Continued)* ─────────────

we continue to treat the pertinent constitutional guarantees as coterminous for purposes of this opinion").

example, the trial court prohibited all inquiry into public drunkenness charges against the prosecution witness that the state had dropped. The state conceded that the underlying events took place, *i.e.*, the witness had been arrested for public drunkenness and the state had dropped charges against him. The Court held that the trial court's ruling violated the defendant's right of confrontation, for if the jury had been allowed to consider those events, it "might reasonably have found [the events] furnished the witness a motive for favoring the prosecution in his testimony." ***Id***., 475 U.S. at 678-79. And in ***Davis v. Alaska***, 415 U.S. 308 (1974), the United States Supreme Court held that the trial court's refusal to allow the defendant to cross-examine a key prosecution witness to show his probation status following an adjudication of juvenile delinquency violated the defendant's constitutional right of confrontation, notwithstanding the state's policy of protecting the anonymity of juvenile offenders. Once again, the trial court prevented the jury from considering an objective, verifiable fact that supports the defense.

The right of confrontation, however, does not permit "fishing expeditions". ***DiBenedetto v. Hall***, 272 F.3d 1, 11 (1st Cir.2001). The court may prohibit cross-examination on a particular subject "if the party is unable to lay a proper evidentiary framework." ***Id***. "Without such limits, unchecked cross-examination on a theory of bias may unfairly prejudice the opposing party's case and only bring forth 'marginally relevant' evidence."

*United States v. Martinez-Vives*, 475 F.3d 48, 54 (1st Cir.2007) (quoting *Van Arsdall,* 475 U.S. at 679).  Thus, in *Martinez-Vives*, the First Circuit found no Confrontation Clause violation where the trial court prohibited cross-examination of two witnesses concerning police bias, because the defendant "[failed to make] any proffer of evidence to serve as a foundation for that theory."  *Id*.  Other courts have reached similar conclusions.  *See Dorsey v. Parke*, 872 F.2d 163, 168 (6th Cir.1989) (trial court's limits on cross-examination of prosecution witness as to his mental stability did not violate Confrontation Clause, where record suggested no factual basis for such questioning); *United States v. McCarty*, 82 F.3d 943, 949-50 (10th Cir.1996) (restricting defendant's cross-examination of his probation officer regarding her allegedly advising defendant that he would experience more favorable probation treatment if he had sexual intercourse with her did not violate defendant's right to confrontation; cross-examination was particularly invasive, injurious line of questioning concerning wholly unsubstantiated allegations of sexual impropriety); *State v. Barnes*, 657 A.2d 611, 615-16 (Conn.1995) (disallowing defendant's proposed cross-examination of victim as to his alleged drug use, financial problems or reports of previous burglaries did not violate defendant's right to confrontation in larceny prosecution; defendant had no reason to believe that victim actually had drug or money problems or had previously reported robberies).

To our knowledge, Pennsylvania appellate courts have not explicitly endorsed the "fishing expedition" limitation on the constitutional right of confrontation. A recent decision by our Supreme Court, however, implicitly endorses this principle. *See Briggs*, *supra*. In *Briggs*, a capital case, the defendant sought to present his brother as the murderer, and as part of this strategy, the defendant attempted to cross-examine a Commonwealth witness, his ex-girlfriend, about threats that his brother allegedly made to her. There was no evidence that the defendant's brother had threatened the witness; to the contrary, the defendant's brother denied during his trial testimony that he threatened her. Even so, the trial court offered to allow this cross-examination if the defendant produced evidence that his brother was in the area of the murder at the time it occurred. The defendant could not provide any such evidence, and the court precluded the proposed cross-examination. Without mentioning the Confrontation Clause, our Supreme Court held that the trial court's decision was a proper exercise of discretion, because "the record [shows] that [the defendant] did not provide the requisite foundation for the avenue of cross-examination he wished to pursue." *Id*., 12 A.3d at 335.

In our opinion, *Briggs'* logic is entirely consistent with the prohibition against "fishing expeditions" in the foregoing decisions interpreting the federal Confrontation Clause. Therefore, we now make explicit what is implicit in *Briggs*: the Sixth Amendment does not entitle the defendant to

cross-examine a Commonwealth witness on a subject for which the defendant cannot provide a factual foundation.

In this case, during Rosser's first trial, S.R. denied under cross-examination that Rosser said, following his sexual assault: "I can't see you again, we could be friends, but I have a girlfriend." Rosser did not testify. Prior to Rosser's second trial, the Commonwealth moved to preclude him from cross-examining S.R. on this subject again. The trial court (like the trial court in **Briggs**) precluded this cross-examination unless Rosser promised to support it with facts in his case-in-chief. Rosser did not testify during his second trial; nor did Rosser posit any reason to believe that S.R. would change her answer on this subject during the second trial. Because Rosser failed to provide any foundation for his proposed cross-examination – *i.e.*, because he failed to provide any evidence that he actually made this statement to S.R. -- the trial court properly precluded defense counsel from cross-examining S.R. about the alleged statement during Rosser's second trial.[7, 8]

_____

[7] In its brief before the panel, the Commonwealth did not argue that Rosser's proposed question to S.R. was improper due to lack of any factual foundation. The Commonwealth merely argued that any error in denying this line of cross-examination was harmless due to the overwhelming evidence of Rosser's guilt. The panel thus reversed Rosser's judgment of sentence without having any realistic opportunity to analyze the Confrontation Clause issue before us now. Nevertheless, for the reasons articulated in footnote 5, **supra**, the Commonwealth has the right to raise
*(Footnote Continued Next Page)*

In his remaining argument on appeal, Rosser argues that the verdict was against the weight of the evidence. We disagree.

The law pertaining to weight of the evidence claims is well-settled:

> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence. An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa.Super.2015) (citations omitted).

The trial court cogently explained why Rosser's weight of the evidence claim was unsuccessful:

_____
*(Footnote Continued)*

this argument during *en banc* proceedings, and we have the authority to affirm the trial court on this basis.

[8] Rosser's *en banc* brief almost completely fails to address the first prong of the *Van Arsdall* test (whether there was any Confrontation Clause error) and focuses mainly on the second prong (whether the error was harmless beyond a reasonable doubt). Because we hold that there was no Confrontation Clause error, we need not address Rosser's argument relating to the second prong of *Van Arsdall*.

As was within its province, the jury believed that [Rosser] attacked, threatened, and forcibly raped [S.R.]. The jury believed [S.R.]'s testimony that her encounter with [Rosser] was not consensual. Video surveillance footage and police records show a mere eighteen-minute span between the time that [S.R.] step[ped] off the bus alone, and the time that she calls the police to report that she had been raped on her walk home. The jury credited [S.R.]'s testimony regarding her decision not to fight back: that the abrupt and forceful way she had been attacked and [Rosser]'s threatening statements made her fearful for her life, and that she believed the only way to survive was to pretend to befriend her attacker. The jury was well aware of the difficult circumstances under which [S.R.] had to tell her family, law enforcement officials, medical examiners, and the jurors themselves, that she had been raped. The jury heard [Officer] Hungerford describe [S.R.]'s apparent agitation and shaky, trembling voice when he arrived at [S.R.]'s house minutes after the incident. The jurors listened to [Nurse] Liskova testify that there are medical reasons why a majority of female patients do not exhibit genital injuries after being sexually assaulted, and opine that her medical findings were consistent with the history and facts that [S.R.] gave her. The jury was well within its province to decide how much weight to give all the evidence presented at trial. This Court did not palpably abuse its discretion by denying [Rosser]'s Post-Sentence Motion for an acquittal or for a new trial based on the weight of the evidence.

Pa.R.A.P. 1925(a) Opinion, at 14-15.

For the reasons given by the trial court, we conclude that it properly exercised its discretion in denying Rosser's challenge to the weight of the evidence.

Judgment of sentence affirmed.

President Judge Emeritus Bender, Judges Panella, Shogan, Lazarus, Ott and Stabile join the Opinion.

Judge Bowes files a concurring statement.

President Judge Gantman concurs in the result.

- 23 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>2/26/2016</u>