J-S92020-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KEVIN BLACKWELL | |
| Appellant | No. 575 WDA 2016 |

Appeal from the Judgment of Sentence January 7, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0005461-2015
CP-02-CR-0006515-2015

BEFORE:  SHOGAN, J., MOULTON, J., and STRASSBURGER, J.[*]

MEMORANDUM BY MOULTON, J.:                    **FILED MARCH 14, 2017**

Kevin Blackwell appeals from the January 7, 2016 judgment of sentence entered in the Allegheny County Court of Common Pleas following his bench trial convictions[1] for burglary (overnight accommodation with person present), aggravated assault, terroristic threats (with intent to terrorize another), unlawful restraint (serious bodily injury), recklessly

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court conducted a bench trial at docket number CP-02-CR-0005461-2015.  Previously, Blackwell had pled guilty at docket number CP-02-CR-0006515-2015 to three counts of driving under the influence, 18 Pa.C.S. § 3802.  On January 7, 2016, the trial court sentenced Blackwell at both docket numbers.  At docket CP-02-CR-0006515-2015, the trial court sentenced Blackwell to 48 hours' incarceration, which Blackwell does not appeal.

endangering another person, criminal mischief (tampering with property), and conspiracy to commit burglary.[2]  We affirm.

The trial court set forth the factual history of this matter as follows:

The credible facts presented at trial established that the March 3, 2015, incident giving rise to this prosecution resulted from prior "bad blood" between Shawn Jackson on one side and [Blackwell] and Patrick Benthin on the other. Trial evidence revealed that at one point Mr. Jackson and [Blackwell] had been friends.  However, within the month prior to March 3, 2015, Patrick Benthin (who was a friend of [Blackwell]'s from California and had recently come to Pittsburgh) had been involved in an altercation with Mr. Jackson at the Car Line bar.  Immediately after the incident at the Car Line bar, [Blackwell] invited Mr. Jackson to his house.  When Mr. Jackson arrived, he was accompanied by two other men.  [Blackwell] told Mr. Jackson that Patrick Benthin would be "right out".  Mr. Jackson and Patrick Benthin then fought.

[Blackwell] and Patrick Benthin went to the residence of Shawn Jackson and Anita Sheets in the early morning hours of March 3, 2015.  Mr. Jackson and Ms. Sheets were awakened by a loud noise on the front porch of their apartment building.  [Blackwell] and Patrick Benthin broke through the bedroom window of the apartment.  They were screaming that Mr. Jackson was "a pussy" and telling him that he was going to die.  They threatened to rape Ms. Sheets.  Patrick Benthin immediately approached Mr. Jackson and began punching him.  The assault escalated and moved into the hallway of the apartment.  Mr. Jackson grabbed a small steak knife that was on the nightstand next to his bed.  Patrick Benthin continued to punch Mr. Jackson and Mr. Jackson stabbed Patrick Benthin in an effort to defend himself.  After [Blackwell] entered the apartment, he confronted Ms. Sheets and pushed her

_____

[2] 18 Pa.C.S. §§ 3502(a)(1)(i), 2702(a)(1), 2706(a)(1), 2902(a)(1), 2705, 3304(a)(2), and 903, respectively.

against a dresser. As the assault escalated into the hallway, [Blackwell] went to assist Patrick Benthin and [Blackwell] joined in on the assault and began punching Mr. Jackson in the face. Ms. Sheets attempted to assist Mr. Jackson. She grabbed a three-foot long wooden board that was in the living room area that was undergoing constriction. She struck Patrick Benthin and [Blackwell] with the wooden board. Both men stopped the attack and fled the residence through the same window that they entered. As [Blackwell] left the residence, he told Ms. Sheets, "I should have let him rape you." Ms. Sheets called 911 and the police responded.

As a result of the assault, Mr. Jackson suffered a broken orbital (cheek) bone, a broken rib, a scratched cornea that required surgery, lacerations that required stitches and various other bruises and scratches. Ms. Sheets suffered minor bruises. [Blackwell] and Patrick Benthin [were] arrested . . .

Opinion, 6/30/16, at 2-3 ("1925(a) Op.").

Following a bench trial on October 22, 2015, the trial court convicted Blackwell of the above charges. On January 7, 2016, the trial court sentenced Blackwell to 3 to 6 years' incarceration for the burglary conviction, 1 to 2 years' incarceration for the unlawful restraint conviction, consecutive to the burglary conviction sentence, and 3 years' probation for the aggravated assault conviction, also consecutive to the burglary conviction sentence. After the trial court denied a series of post-sentence motions, Blackwell filed a timely notice of appeal on April 22, 2016.

Blackwell's sole issue on appeal is "[w]hether the trial court abused its discretion in allowing [Jackson] to invoke his right to remain silent which interfered with [Blackwell]'s right to cross-examination and right to confrontation[.]" Blackwell's Br. at 5. According to Blackwell, the trial court

erred when it curtailed his counsel's line of questioning about a prior fight between Benthin and Jackson. *Id.* at 12, 24.

About one month before the burglary and assault, Blackwell and Benthin were involved in at least two altercations with Jackson. Blackwell's counsel questioned Jackson about these incidents, for a limited purpose, to establish Jackson's motivation to testify against Blackwell. N.T., 10/22/15, at 55-56. Jackson testified that about one month before the March 3, 2015 incident, he went to Blackwell's house, where he and Benthin fought. *Id.* at 57-59. Blackwell's counsel then asked for details regarding the incident:

> [BLACKWELL'S COUNSEL]: Okay. Who else was outside during the fight? What were their names?
>
> THE COURT: Did you bring other people with you is the question.
>
> [JACKSON]: I got a ride out there, because I don't have a driver's license.
>
> THE COURT: No explanation, sir.
>
> [JACKSON]: Yes.
>
> THE COURT: Answer the question.
>
> [JACKSON]: Yes, sir.
>
> THE COURT: Did you bring other people?
>
> [JACKSON]: I got a ride.
>
> THE COURT: Don't talk over the Judge. That's a real bad idea.
>
> Did you bring other people with you?
>
> [JACKSON]: Yes, sir.
>
> THE COURT: How many?

[JACKSON]:    Two.

THE COURT:    Okay.  So there were three total counting you.  There were three of them.

  Go ahead, [counsel].

[BLACKWELL'S COUNSEL]:    And who were those two individuals' names?

[JACKSON]:    I'd rather not say.

[BLACKWELL'S COUNSEL]:    Your Honor –

THE COURT:    The [witness]'s assertion of his fifth amendment privilege is recognized.  Since you are trying to bring out some type of conspiracy to commit a criminal act, he said he'd rather not say, I view that as his assertion of his right to remain silent and not implicate himself in criminal conduct.  Move on.

[BLACKWELL'S COUNSEL]:    Okay.  And during the fight with Mr. Benthin –

THE COURT:    Potential criminal conduct, I should say.  I'm not making any conclusions it was.  As you know, if it tends to prove – if it tends to incriminate him he may assert his rights.  I recognize his assertion of his right.

*Id.* at 59-61.  Jackson then testified that the men ended the fight and went their separate ways.  *Id.* at 61-62.

Blackwell argues that the trial court erroneously concluded that Jackson's answer of "I'd rather not to say" was an invocation of his Fifth Amendment privilege against self-incrimination.  *Id.* at 12, 23.  According to Blackwell, the trial court's ruling prevented Blackwell from confronting Jackson through cross-examination, as "the identities of the other persons were probative to [Blackwell]'s confrontation rights."  *Id.* at 24.  Blackwell argues that "[t]he age, sex, and physical health of these persons were

relevant," as "[Jackson]'s eighty-five-year-old grandfather, or his four-year-old son would be a stark contrast to a physically fit boxer that was twenty-eight years of age." **Id.** We disagree.

Both the Sixth Amendment to the United States Constitution and Article One, Section Nine of the Pennsylvania Constitution secure the right of the accused to confront witnesses against him. **See** U.S. Const. amend. VI; Pa. Const. art. I, § 9. "Whether [a]ppellant was denied [his] right to confront a witness under the confrontation clause of the Sixth Amendment is a question of law for which our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Yohe**, 39 A.3d 381, 384 (Pa.Super. 2012) (quoting **Commonwealth v. Dyarman**, 33 A.3d 104, 106 (Pa.Super. 2011)).

The Confrontation Clause "provides that all criminal defendants enjoy 'the right to confront and cross-examine adverse witnesses.'" **Commonwealth v. Rosser**, 135 A.3d 1077, 1087-88 (Pa.Super. 2016) (quoting **Commonwealth v. Laird**, 988 A.2d 618, 630 (Pa. 2010)). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." **Davis v. Alaska**, 415 U.S. 308, 315-16 (1974) (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)). However, this right "is not absolute." **Rosser**, 135 A.3d at 1088. "The trial court may place reasonable limits on defense counsel's cross-examination of a prosecution witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s]

safety, or interrogation that is repetitive or only marginally relevant.'" **Id.** (quoting **Delaware v. Van Arsdall**, 475 U.S. 673, 679 (1986)). "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." **Id.** (quoting **Delaware v. Fensterer**, 474 U.S. 15, 20 (1985)).

In **Rosser**, we articulated a two-part test to determine "whether a limitation on cross-examination violates the Confrontation Clause":

> First, we inquire whether the limitation prejudiced the examination of that particular witness. In other words, absent the limitation, would the jury have received a "significantly different impression" of the witness's credibility? [**Van Arsdall**, 475 U.S.] at 679-80 . . . . Second, if there was error, we must determine whether it was harmless beyond a reasonable doubt; if so, reversal is not warranted. **Id.** at 681 . . . .

135 A.3d at 1088.

We conclude that the trial court's decision to prevent further questioning regarding the identity of the two individuals who were with Jackson one month before the crime did not violate Blackwell's right to confront witnesses.[3] The testimony Blackwell sought to elicit from Jackson

---

[3] Blackwell's brief argues that the trial court erred in concluding that Jackson invoked his Fifth Amendment privilege against self-incrimination and therefore violated Blackwell's right to confront witnesses under the Sixth Amendment and Article One, Section Nine of the Pennsylvania Constitution. **See** Blackwell's Br. at 12-23. Even if we agreed with Blackwell that the trial court erred in finding that Jackson properly invoked his Fifth Amendment privilege, we would conclude that such error was harmless because the
*(Footnote Continued Next Page)*

- 7 -

was, at most, marginally relevant. The trial court allowed Blackwell to inquire about the prior fight to establish Jackson's motive to testify against Blackwell. The identities of the two persons Jackson brought to that fight is irrelevant to that determination. Further, the trial court would not have received a "significantly different impression" of Jackson's credibility had it instructed Jackson to answer the question. The trial court found that Blackwell "was permitted to clearly develop the record that there were two prior altercations involving the parties" and "the existence of the 'bad blood' between the parties." 1925(a) Op. at 10. Further, the trial court found that "the identities of the persons with Mr. Jackson at [Blackwell]'s residence had no bearing on [its] verdict because other trial evidence was so overwhelming that any error was harmless." *Id.* We conclude that curtailing this line of questioning did not violate Blackwell's right of confrontation. *See Van Arsdall*, 475 U.S. at 679 (quoting *Fensterer*, 474 U.S. at 20) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about . . . interrogation that is . . . only marginally relevant.").

Judgment of sentence affirmed.

_(Footnote Continued)_ ───────────

names of Jackson's accomplices were, at most, marginally relevant to the proceedings. *See Commonwealth v. Molina*, 33 A.3d 51, 66-71 (Pa.Super. 2011) (applying harmless error analysis to Fifth Amendment violation). The incident occurred one month prior to the burglary and the identities of these accomplices had no bearing on Jackson's credibility.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  3/14/2017