J-S37038-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| OLVIN T. PAZ | : | |
| | : | |
| Appellant | : | No. 611 EDA 2025 |

Appeal from the Judgment of Sentence Entered October 24, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002004-2024

BEFORE: DUBOW, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED DECEMBER 12, 2025**

Appellant, Olvin T. Paz, appeals from the judgment of sentence entered in the Philadelphia Court of Common Pleas on October 24, 2024. After a careful review, we affirm.

The relevant facts and procedural history as summarized in detail by the trial court are as follows:

> On February 15, 2024, Appellant returned home where his romantic partner, Ludys Lara, and her 4 year old son were residing. Appellant was intoxicated. After Ms. Lara expressed her displeasure with his drinking, Appellant proceeded to grab her by the neck, squeezing until she stopped breathing, and then threw her to the ground. In response, Ms. Lara's 4 year old son attempted to intervene by jumping on Appellant's back, but Appellant threw the child as well. Appellant then placed his hands over both victims' mouths so they could not call out for help and brought them into Ms. Lara's bedroom. Appellant proceeded to confiscate and break Ms. Lara's phone. He warned Ms. Lara if she

_____

[*] Former Justice specially assigned to the Superior Court.

attempted to leave, he would kill both her and her child. The next morning, Appellant permitted Ms. Lara to go to work. When Ms. Lara reached her employer, she called the police to report the incident. The police responded to Ms. Lara's residence and took Appellant into custody.

On October 16, 2024, Appellant waived his right to a jury trial and proceeded with a bench trial. The relevant testimony of the two (2) witnesses follows. [Both witnesses testified with the assistance of a Spanish interpreter].

Ludys Lara:

On February 15, 2024, at approximately 8:00 P.M., Ms. Lara was in her residence, located in the City and County of Philadelphia. At that time, Ms. Lara's romantic partner, Appellant, arrived home drunk. She expressed her dissatisfaction with his drinking. Appellant then grabbed her by the neck. Ms. Lara had trouble breathing and soon stopped breathing. Appellant then threw her on the floor, causing injury to her head. In response, Ms. Lara's four year old son intervened by jumping on top of Appellant, who in turn threw the young child. Appellant proceeded to throw Ms. Lara and her son onto the bed. During the assault, Ms. Lara's son, "was crying a lot and he has epilepsy and he wasn't well" and was crying. N.T. 10/16/24, at 15 ¶11-12. Appellant placed his hand over both victims' mouths in order to stop them from crying out and alerting others. Ms. Lara did not get up from the bed out of fear Appellant would hit her or her son. *Id*, at 11-14, 15 ¶12, 22, 24-25, 28¶17, 29.

Appellant told Ms. Lara that the two of them needed to "work stuff out." *Id.*, at 17 ¶13. Appellant warned Ms. Lara if she left, he would kill both her and her son. Appellant took Ms. Lara's cell phone and broke it, preventing her from calling for help. Appellant remained awake all night so that Ms. Lara and her son would not leave. *Id.*, at 16-17, 23, 29. In the morning, Appellant allowed Ms. Lara to go to work, and she assured Appellant that she would not tell anyone what had happened the night before. However, when Ms. Lara got off the bus, her boss was waiting. After disclosing what had happened the night before, her boss instructed Ms. Lara to call the police. After the police responded and arrested Appellant, photographs were taken of the bruising to Ms. Lara's neck. Both Ms. Lara and her son were taken to the hospital. *Id.*, at 17-20, 26-28, 44.

Appellant:

Appellant testified that on February 15, 2024, he and Ms. Lara did get into an argument about his drinking. Appellant, however, denied hitting Ms. Lara or her son. *Id.*, at 33-34, 36. Appellant alleged that he "was going to" put his hands on Ms. Lara's neck, but restrained himself from doing so and instead went into her son's room to get away from her screaming. *Id*, at 34 ¶1, 36-37. Appellant denied preventing Ms. Lara from leaving the residence. Appellant also denied threatening to kill Ms. Lara or her son, or breaking her cell phone. *Id.*, at 34-38. Appellant further testified that the next morning, he made Ms. Lara coffee. After she left for work, Appellant received a text from Ms. Lara instructing him not to take her son to school. The police soon arrived to arrest Appellant for the assault. Appellant admitted to at least one time phoning Ms. Lara and telling her not to come to court. *Id.*, at 38-39, 41-42.

At the conclusion of the bench trial, after finding Ludys Lara's testimony credible and Appellant's incredulous, the Trial Court found Appellant guilty of two counts of simple assault, (one count a misdemeanor in the second degree for victim Ludys Lara, and the other count a misdemeanor in the first degree for the four year old victim), one count of strangulation, and one count of terroristic threats.

On October 24, 2024, at the sentencing hearing, Appellant's counsel argued that Appellant's [sic] had "a true zero" prior record score and warranted a mitigated sentence. N.T. 10/24.24, at 7-8¶22, 9-10, 15. Appellant's counsel also argued that a mitigated sentence was warranted due to Appellant's undocumented immigration status so that he would not be deported. With respect to possible sanctions outside of incarceration, Appellant's counsel had the following dialogue with Appellant:

Q: [Y]ou expressed that you wanted to do anger management counseling; is that correct?
A: Yes.
Q: You also wanted to go through drug and alcohol treatment to address your drinking?
A: Yes.
Q: And that you're not going to have any contact with Ludys Lara ever again; right?
A: Yes.
Q: Is there anything else you would like to say?

A: No, it's fine.

***See, Id.***, at 15 ¶¶2-15. The Commonwealth's attorney requested an aggravated range sentence be imposed due to the nature of the offense, especially the assault of a four year old child. ***Id.***, at 6-10, 14.

After reviewing the presentence investigation report, and considering oral arguments from both counsel, determining Appellant's testimony not credible, either at trial or sentencing, Appellant not demonstrating remorse, and Appellant's physical assault of a four-year-old, epileptic child, the Trial Court opined Appellant was a danger to the community and recidivism would occur. ***Id.***, at 15-16. Accordingly, the Trial Court sentenced Appellant to the following: one (1) to three (3) years [of] incarceration for strangulation; one (1) to three (3) years [of] incarceration for the misdemeanor in the first degree simple assault (the minor victim); one (1) to three (3) years [of] incarceration for terroristic threats; and no further penalty for the misdemeanor in the second degree simple assault (the adult victim). Although the offense involved one incident, because two (2) victims were involved, the sentence involving the minor victim was made consecutive, resulting in an aggregate of two (2) to six (6) years [of] incarceration, resulting in a standard range sentence for the lead offense of strangulation.

After the Trial Court handed down his sentence, Appellant was informed of his appellate rights by his counsel, the following exchange occurred between himself and counsel:

Q: Do you have any questions about your sentence?
A: Yes.
Q: What questions do you have about your sentence?
A: The reason that I said what I said was because I didn't understand what was being said and what was being translated.
Q: Do you understand that you are being sentenced to two to six years of state incarceration?
A: Yes, yes.
Q: And do you understand your appellate rights, that ten to 30 day time frame?
A: Yes.
Q: At this point do you wish to take either of those appeals?

A: Yes.

*See, Id.*, at 19 ¶¶13-23.

Tr. Ct. Op. at 1-7 (footnotes omitted).

Appellant filed a timely post-sentence motion on November 4, 2024, which was denied without a hearing on January 31, 2025. On March, 3, 2025, Appellant filed a timely notice of appeal. On March 25, 2025, Appellant filed his concise statement pursuant to Pa.R.A.P. 1925(b). The trial court filed its Rule 1925(a) opinion on April 4, 2025. This appeal followed.

Appellant raises these two issues for our review, verbatim:

1. Did not the trial court abuse its discretion and violate Appellant's right to confront witnesses when it denied him the opportunity to cross examine the Commonwealth's key witness regarding whether the complainant wanted the defendant to be deported, thus demonstrating her bias and willingness to exaggerate, and this error was not harmless?

2. Was not the defendant denied his rule based and constitutional right to be present at all phases of his trial when he was constructively absent from his sentencing because he could not hear or follow the proceedings due to technological and interpreter problems?

Appellant's Br. at 2-3.

Appellant's first issue concerns the scope of his cross-examination of Ms. Lara. In considering this issue, we are guided by the following principles. "The scope of cross-examination is a matter left to the sound discretion of the trial court, and the trial court's rulings will not be disturbed absent an abuse of discretion." *Commonwealth v. Boczkowski*, 846 A.2d 75, 96 (Pa. 2004). "A defendant has a fundamental right to present evidence provided that the

- 5 -

evidence is relevant and not subject to exclusion under one of our established evidentiary rules." ***Commonwealth v. McGowan***, 635 A.2d 113, 115 (Pa. 1993) (citation omitted). Relevant evidence "tends to prove or disprove some material fact, or tends to make a fact at issue more or less probable." ***Commonwealth v. Patterson***, 91 A.3d 55, 71 (Pa. 2014).

> The trial court may place reasonable limits on defense counsel's cross-examination of a prosecution witness "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." ***[Delaware v.] Van Arsdall***, 475 U.S. [673, ] 679 [1986]. "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ***Delaware v. Fensterer***, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985).
>
> ***Van Arsdall*** articulates two inquiries for determining whether a limitation on cross-examination violates the Confrontation Clause. First, we inquire whether the limitation prejudiced the examination of that particular witness. In other words, absent the limitation, would the jury have received a "significantly different impression" of the witness's credibility? ***Id.*** at 679-80. Second, if there was error, we must determine whether it was harmless beyond a reasonable doubt; if so, reversal is not warranted. ***Id.*** at 681.

***Commonwealth v. Rosser***, 135 A.3d 1077, 1088 (Pa. Super. 2016).

Here, Appellant argues that the court inappropriately limited his cross-examination of the victim, Ms. Lara, when it sustained a Commonwealth objection to a question about deportation. Appellant's Br. at 9-10. At trial, defense counsel asked the victim, "You want [Appellant] to be deported?" N.T., 10/16/24, at 2. The Commonwealth objected and the trial court

sustained. *Id*. Defense counsel replied, "It goes to potential bias, Judge, and I'll completely move on from this topic." *Id*. The trial court replied that the question was "totally irrelevant." *Id*. Appellant argues that in refusing to allow that line of questioning, the trial court violated his right to confront the witness against him because the question would have shown her motivation to make a false allegation to have Appellant incarcerated or deported. Appellant's Br. at 9, 11. Appellant argues that there was minimal corroboration of her testimony as she was the only witness to the crime. *Id*. at 13-14.

First, we note for clarity that Appellant was given the opportunity to confront the witness against him and that defense counsel did engage in cross-examination. The trial court did not *sua sponte* limit the scope of cross-examination; it merely sustained this one Commonwealth objection. We review a trial court's evidentiary rulings in directing the scope and extent of cross-examination for a clear abuse of discretion. ***Commonwealth v. Woeber***, 174 A.3d 1096, 1103 (Pa. Super. 2017). Accordingly, we must decide if the court abused its discretion in sustaining the Commonwealth's objection and determine if the fact-finder would have received a "significantly different impression" of the witness's credibility had she answered the question. ***Rosser, supra***.

Here, the trial court stated the following:

In the instant matter, the Trial Court determined that the question regarding Ludys Lara's alleged desire to have Appellant deported was irrelevant to the issues at trial. . . . Not only did the Trial Court observe Ms. Lara's demeanor when she testified, but also the

- 7 -

photographic evidence, showing the bruises on her neck, corroborated her testimony. Therefore, it is immaterial whether Ms. Lara may have wished for Appellant to be deported, the Trial Court would not have reached a different outcome regarding the witness's credibility. This is in contrast to the Trial Court's determination that Appellant testified incredulously.

Tr. Ct. Op. at 9.

We agree with Appellant that the court's ruling on the objection was an abuse of discretion because the issue was at least "marginally relevant," **Rosser, supra**. While Ms. Lara herself has no control over Appellant's deportation, his conviction in this case is cause for deportation, and her knowledge of that result if Appellant were convicted could be motive for her to fabricate her narrative. The trial court allowed only one question about Ms. Lara's potential bias in testifying, whether the Appellant's intoxication continued to upset her. N.T., Trial, 10/16/24, at 25. This question did not cover the same thought processes that the prohibited question about deportation could have revealed.

Nonetheless, any error in sustaining the Commonwealth's objection was harmless.[1] A reviewing court may find harmless error if, *inter alia*, "the error did not prejudice the defendant or the prejudice was de minimis." **Commonwealth v. Hairston**, 84 A.3d 657, 671 (Pa. 2014). Here, the trial court as fact-finder observed both adults involved in the incident testify and looked at Ms. Lara's neck to compare it to the photograph. **See** N.T.,

_____

[1] Indeed, the trial court opinion discusses only whether its error was harmless.

- 8 -

10/16/24, at 43–46. The finger-shaped bruise in the photograph was not consistent with Appellant's narrative that it was "a shadow." *Id.* at 34. Instead, it was objective evidence of strangulation.

Appellant argues that without Ms. Lara's testimony that she could not breathe, the bruise only establishes lesser crimes of harassment or simple assault. We disagree; the location of the bruise itself supports a finding that Ms. Lara was unable to breathe. The trial court found the victim's testimony credible and corroborated by the photographs. It found the Appellant to not be credible. It is the factfinder's function to weigh the evidence, and it is free to accept all, part, or none of the evidence. *Commonwealth v. Hopkins*, 67 A.3d 817, 820 (Pa. Super. 2013), appeal denied, *Commonwealth v. Hopkins*, 78 A.3d 1090 (Pa. 2013). Thus, Appellant is not entitled to relief on this evidentiary issue.

Appellant's second issue is that he was denied his right to be present at all phases of his trial when he was "constructively absent" from his sentencing because he was unable to follow or hear the proceedings. Appellant's Br. at 17. At sentencing, the court asked if Appellant had any question to which Appellant replied, "The reason that I said what I said was because I didn't understand what had been said and what was being translated." N.T., 10/24/24, at 19. Appellant argues that the trial court did not attempt to find out what part of the hearing he misunderstood and made no meaningful attempt to address his problem. Appellant's Br. at 17. Accordingly, he argues,

we should find that he was constructively absent from the proceeding and remand for resentencing. *Id.* at 19-20. This issue is meritless.

Appellant was provided a translator for all proceedings. The record for the sentencing hearing reveals that when he was given the opportunity to speak on his own behalf, he reported having difficulty hearing the interpreter due to static. N.T., 10/24/24, at 13. He promptly notified the court, at which time the court repeated what it had just said; that he was being given the opportunity to speak but was not compelled to, and that his attorney was there to speak on his behalf as well. *Id*. Appellant replied to the court that there was nothing he wanted to say. *Id.* at 14. Following that, the record demonstrates that Appellant communicated with his counsel and the trial court throughout the sentencing hearing without pause or delay, showing that he was present and able to participate, and that any technical issues were resolved. N.T., 10/24/24, at 14-20. The trial court stated:

> Appellant's responses to questioning were clear and concise, showing no hesitation or misunderstanding. Appellant through the interpreter expressed not only a desire to engage in specific programs as an alternative to incarceration but also his intention to stay away from the victims permanently. Even after Appellant raised the incredulous assertion that he could not hear due to technical issues, he demonstrated that he could hear and understand by affirmatively responding to counsel's question regarding his right to appeal.

Tr. Ct. Op. at 8.

We agree with the trial court. At the time Appellant stated that he could hardly hear the interpreter because of static, his sentence had not been

- 10 -

imposed and he had not yet been advised of his rights. The only material discussed up to that point in the hearing was Appellant's prior record score, the offense gravity scores, Appellant's counsel's description of Appellant's background and past, and the Commonwealth's expression of the victim's statements. N.T., 10/24/24, at 5-13. Assuming *arguendo* that Appellant's reported difficulty in hearing the translator was credible and sincere, any discussion he may have misunderstood at the point could not have resulted in a violation of Pa.R.Crim.P. 704 (stating that a defendant's rights at sentencing are to be afforded the opportunity to make a statement and to be advised of his right to counsel, to file a post-sentence motion and an appeal, the time in which a motion must be filed and decided, and the preservation of issues). Appellant expressly denied the opportunity to speak and expressly affirmed when his counsel asked if he understood his sentence, his appellate rights, and his wish to pursue the appeal.

Appellant did not indicate that he had an ongoing misunderstanding that needed to be addressed, nor does he argue in his brief that he misunderstood any of his constitutional rights, appellate rights, or any aspect of his sentence itself or the conditions thereof. The court repeated the Rule 704 material that Appellant may have missed, N.T., 10/24/24, at 13, and his competent counsel did not ask the court to repeat any other part of the proceedings because counsel recognized that Appellant understood his sentence and his rights

under Rule 704. Because Appellant's second issue is meritless, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/12/2025