J-S70025-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| GREGORY STENCIL | |
| Appellant | No. 1883 EDA 2015 |

Appeal from the Judgment of Sentence April 23, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0015163-2012

BEFORE:  OLSON, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                    **FILED JANUARY 18, 2017**

Gregory Stencil appeals from the judgment of sentence imposed on April 23, 2015, in the Court of Common Pleas of Philadelphia County, made final by the denial of post-sentence motions on June 15, 2015.  On August 28, 2014, a jury convicted Stencil of burglary and theft by unlawful taking.[1] The court sentenced Stencil to a term of three-and-a-half to seven years' imprisonment.  On appeal, Stencil raises a weight of the evidence claim.  For the reasons below, we affirm.

The trial court set forth the factual history as follows:

> The most direct identification evidence came from the testimony of two of the police officers who responded to the call of a burglary and actually saw the defendant perpetrating it.

---

[1]  18 Pa.C.S. §§ 3502(a) and 3903(b)(1), respectively.

Officer Hillary Hudson testified that on December 3, 2012, at 5:15 a.m., he and another officer, both in uniform, responded, separately but simultaneously, to a radio report of a burglary in progress at 2216 Fitzwater Street in Philadelphia and, when they arrived:

> … we went to the front door, knocked on the door.  I was looking in the front window, and I seen legs on the second floor.  So I let my partner know, which was Davies, that the complainant was coming downstairs.  So as this person was coming down the stairs, it wasn't the complainant.  It was the burglar [whom he then identified as being the defendant [Stencil]].

He described the front window as a "real big" bay window with nothing covering it and the lights in the house being on; he watched [Stencil] come down the stairs, and when he got to the bottom, what "… struck me as odd is he looked directly … at me and then he shut the vestibule door and proceeded to go out the back."  He was wearing a dark hoodie and black gloves, and, after he shut the door, the officer went around the corner and climbed over a wall to get into an alleyway behind the houses on Fitzwater, while Davies stayed at the front door; there were no other people around, and he saw [Stencil] in the alleyway.

A.  I seen [Stencil] jump from yard to yard, and he was trying to get away.

Q.  Did you go in there and – did you eventually apprehend him?

A.  Yes.

Q.  How did you catch him?

A.  He was behind an air conditioning unit.

Q.  Where?

A.  On – it was – the next street over is Saint Albans, and he was in their yard.  I don't know the address.

Q.  So Saint Albans is south of the alleyway?

- 2 -

A. Yes.

Q. So when you say it was a Saint Albans' address, was it the back yard?

A. The back yard, correct.

Q. So essentially, these backyards – the backyard of 2216 Fitzwater Street would abut the backyards of the Saint Albans Street houses?

A. Yes.

Q. And then the alleyway's in between those backyards?

A. Yes.

Q. So when you saw him behind the air conditioner, did you tell him to come out?

A. Yes. I – he immediately stood up. I grabbed his hoodie and I told him to hop the fence … What he did was he backed up and his hoodie ripped in my hand. I thought then he's going to run, but he didn't. He said I ripped his hoodie, hopped the fence, and he wanted to fight me.

Q. And what happened after that?

A. Basically clotheslined him; he fell down. We pulled him out. And then we cuffed him.

* * *

Q. Now, when you found [Stencil], did he have black gloves on?

A. No.

Q. Did you go to look for those black gloves?

A. No, I didn't.

Q. Do you know how many yards he hopped through?

A. At least two.

Testifying from a property receipt he prepared, sixty dollars was recovered from [Stencil] in the form of two twenties, one ten, one five, one two, and three ones, which were returned to the complainant; the address [Stencil] had given him to put on the property receipt was 1541 North Alden. He said he did not know whether any tokens were recovered from [Stencil] (tacitly indicating that they were not listed on the receipt), and then identified the other officers who were there and their locations.

On cross-examination, [Officer Hudson] testified that Davies had knocked on the door while he looked through the window, that he had a clear view of [Stencil] and was able to recognize him from his face as opposed to his clothing. Counsel noted that in his description of [Stencil], the officer did not mention [Stencil] having facial hair or his height; in posing his question on this point, counsel did not make clear whether he was referring to the description of [Stencil] in the officer's testimony, property receipt or his report of the incident. He did not, nor know who did, flash [Stencil]'s description over the radio. He lost sight of [Stencil] when he went from the front to the back of the house and once again after seeing him jump into and out of two properties; it was noted that Catherine Street is one block south of Fitzpatrick (an aerial photograph showing that Saint Albans is a small street in between and, in common Philadelphia parlance, the distance between it and either of the other larger streets are not considered full blocks), and, when asked if he lost sight of him for a few minutes, said, "Not minutes." He did not search, or recover the money from, [Stencil]; it was given to him by whomever did and he could not recall who that was. On recross, it was noted that, when he "ran [Stencil's] address … it came back to 2229 Catherine Street". In his opening statement, defense counsel stated that [Stencil] lived at 23rd and Catherine and characterized his activity at the time of his arrest as just "walking a block from his house with some money and some SEPTA tokens["], but no evidence of his actual address at the time, except what Officer Hudson said he told him, was submitted, or that would support such a characterization of his actions that morning.

* * *

- 4 -

The Commonwealth then called the complainant, Anne Crawford, who testified that she and her husband had just moved into 2216 Fitzwater exactly one month before December 3rd and on that date she was home alone. She described the house as having three floors plus a basement, the front as having a front door and an inside vestibule door, French doors in the back that enter onto a cement patio, approximately thirteen by ten feet, surrounded by a six-foot cement block wall. Behind the backyard is a "really thin" alleyway that goes between her row of houses and the backs of the houses on the next street, Saint Albans, and the front of the house consisted of a three-panel bay window in which there were no window treatments that day because they were taken down and going to be replaced because they were having the house painted. On that morning, she was asleep in her bedroom on the third floor in the back of the house when she was awoken by the house alarm going off and the sound of someone "like really like pushing on or shoving something around" coming from the kitchen area two floors below her; at first she was "caught off guard for a couple seconds" then called 911 (at which time an audio recording of the call was played). She got out of bed, stayed in the bedroom, put on her robe and called 911 again because, while "the banging … at the door … had gone away [she] had heard someone running through the house [and] knew somebody was in the house … didn't know if it was one person or three people" and "eventually heard them go to the second floor" (whereupon an audio recording of that call was played; in later testimony it was noted that during that call, she was advised that the police were at her front door). She went to the third floor front window and saw the police, one of whom, who turned out to be Officer Davies, told her she could come down to the first floor which she did and let them in. They all walked through the house and she noticed:

A. The first floor, the – my handbag was dumped on the dining room table. So everything was falling out of it, and it had been gone through. There was about $40 cash missing and some subway – or bus tokens and a special $2 bill that was like tucked in the back of my wallet from my grandmother.

And then there was a Nordstrom shopping bag that had some baby clothes in it that the black laptop that was in the kitchen in the back of the house had been put into,

and that was put by the front door right inside the vestibule door.

And then on the second floor in the bedroom in the back, just drawers were open and boxes gone through. The best was – the mattress was kind of pushed off of the box spring like somebody was feeling under the mattress for something.

Q. And now, were the baby clothes in the Nordstrom bag when you went to sleep?

A. Yes.

Q. But the laptop was not?

A. No.

One of the officers pointed out to her that her back door wasn't closing; they tried to fix it but couldn't, and she had to have it repaired later. She did not know the defendant and never gave him permission to be in her house or take anything from it.

Officer Kimyatta Davies testified that she arrived at the house the same time as Hudson:

A. When I first got on location, I checked the doors to see if any of the doors were open, rung the doorbell, looked inside of the house. There was no window – no blinds or anything. So you could clearly see right through the house.

* * *

Q. And while you were at the front door, did you see anyone that you see in court today?

A. Yes; [Stencil].

* * *

Q. Where did you see him?

A. I saw him coming down the stairs. We were looking into the house. We were right – knocking on the door, rung the doorbell, hopefully trying to locate the complainant. No one was responding. Then someone started walking down the stairs.

We was like, Oh – I said, "Okay, maybe that's the complainant coming down the steps."

And that's when I observed the male in plain view walking down steps, and he looked directly at us.

Q. And after he looked right at you, what did he do?

A. He came straight towards the door, … the vestibule door. And after he saw – when he looked at us. And that's when he started running towards the rear of the property. And that's when I came over with the flash saying that the male was running out towards the rear of the property.

She waited at the front door when Hudson went to the back; when the complainant came to the third floor window she told her to wait there until she was told that the other officers had apprehended a suspect. In her report she listed the items taken as fifty-eight dollars, a two dollar bill and five packets of tokens. She then was shown [Stencil]'s arrest photograph:

Q. And does that accurately depict how he looked on that evening?

A. That's correct.

Q. In that photo, what is his clothing?

A. Dark clothing with a white T-shirt.

Q. And it's – the shirt, the sweat shirt or the dark clothing, it's ripped, is it not?

A. Yes, it is.

On cross-examination [the officer] testified that the house was dark but she saw [Stencil] clearly through the front door

window using her flashlight, and in her flash description of [Stencil], she said he was clean shaven. On redirect, it was pointed out that, in the photograph [Stencil] had "some facial hair." The photograph does show [Stencil] with a very light beard and mustache.

Q. And when you put out flash information, what – typically what do you – what do you state for facial hair?

A. If – in the facial hair, sometimes it can get a little tricky with – if someone's running and you see flashes just quick. So it appeared to me that night that he had – he was clean shaven. Like I said, when he went – ran down the – when he went down the steps and looked at me, he had his head down. He wasn't like looking up. So when he turned his head really fast when I looked at him, that's what I appeared – that was the flash I put out.

On recross, counsel attempted to belabor the point:

Q. Officer, so you're saying that you had [a] very quick look at this gentleman's face?

A. With his facial hair, I did; but for when he looked in my eyes, he looked right at me. He looked down and he ran and he turned over and pivoted.

Q. Okay. And it sounded like when you were answering Mr. Gehrke's question, that you were speaking from experience, that sometimes it's hard to –

A. Just the experience of when it's very dark with the shaven and flash information that you give out – when he went down – actually, when he went down – so that was – I didn't see like a beard. I saw shaven. I saw this part of his face. So when he went down and if somebody look at you and do like that, you're not going to see all of that. You're going to see his eyes. You're going to see his nose. You're going to see his head. You're not going to see that part.

And I'm a little short. I'm five-one. Officer Hudson being six-five, six-seven, he would see more than me.

Q. Because you were looking in the window –

A. Right. Exactly.

Q. – of the door?

A. Of the door.

Q. So just to be clear for the jury, you were unable to tell – to see his face long enough to determine his facial hair, correct?

A. That's correct. With the facial hair, yes.

Q. However, you specifically put out over police radio clean shaven?

A. Yes.

Q. Okay. Yet, you're able to today in court identify him by his face as being the same man who was in the house?

A. Yes.

Officer Robert Slobodian testified that he and his partner, Officer Francis McGrenra, received the radio call, went to the area of 22nd and Fitzwater Street, and:

A. As we were approaching, officers that were already on location stated that they observed a black male fleeing from the rear of the location into the alley. I observed Officer Hudson coming around the corner, and I assisted him to block the alley over there.

Q. Where did – where did McGrenra go?

A. He went to the front with Officer Davies.

Q. And was that just because you needed another officer at the front?

A. Since she was there by herself and in case the male went back to the front – to go to the front, he went to back her up.

Q. And this alleyway – this was approximately 5:20 in the morning.

Was there anyone out there?

A. No.

Q. This alleyway, did you end up going in that alleyway?

A. Yes. After we seen the male hopping through the yards, myself and Officer Hudson and Sergeant Crawford gained access to the alley.

Q. How did you gain access to the alleyway?

A. On Saint Albans Street, the alley opened up going northbound, and I believe I hopped a fence to get into it.

Q. And when you were back there that evening, did you encounter anyone that you see in the courtroom today?

A. Yes; [Stencil] sitting next to counsel.

* * *

Q. Where did … you find him or did someone else?

A. We were all walking together searching the yards. So it was pretty much simultaneously everyone found him.

Q. Where was he?

A. He was actually in a yard on Saint Albans Street hiding right by an air conditioner.

Q. And who went in to – did [Stencil] come out?

A. When we spotted him, he walked out. We were actually in the alley. He was inside the fenced-in yard. We ordered him to come over. At first, he didn't comply. So Officer Hudson grabbed him by the shirt, which caused the shirt to rip. And then the male hopped over the fence.

Q. And how did you get him out of the alleyway? Did you to – did you have to open up another fence, or what?

A. Once we had him secured, he placed him in custody, and I went to walk him out the same way I came in. I believe a neighbor had a key to the gate to open up the alley. So we just walked him out.

Q. Then did you take him – was he taken in your patrol car?

A. Yes. My partner – after we got him in custody, my partner met me around there with my patrol car.

Q. And when you say your partner, you're referring to McGrenra?

A. Yes.

Q. Did you guys end up transporting [Stencil] to Methodist Hospital?

A. Yes.

Q. And was that because of a particular concern or was it a routine check?

A. There was an altercation in the alleyway to get him secure and detain him and just precautionary.

On cross-examination, he described seeing [Stencil] jumping from yard to yard on the Fitzwater side of the alleyway and then into one on the Saint Albans side and losing sight of him; he and the other officers began looking into yards with flashlights and found [Stencil] in one of them, at which point Officer Hudson grabbed and ripped [Stencil]'s hoodie, [Stencil] jumped at him, and the officers all subdued him.

Officer Francis Mc[G]renra testified to searching [Stencil] and recovering from him the money and the SEPTA tokens, reading what he had recorded in a property receipt, describing the former in the same denominations previously identified and the latter as "there's a bag of tokens, one token in a bag, two tokens in a bag, and five tokens in Bag 5, it looks like." Officer

Patrick Dio testified to "holding the alley" while the others searched, a homeowner giving him a key to open the gate for them when the other officers were bringing [Stencil] out, transporting [him] from the hospital to the district and [he was] kicking another officer there when she was trying to unshackle his legs. On cross, the officer testified that he recovered the money and the tokens from one of [Stencil]'s pockets; defense counsel had him point out that he would only have taken from [Stencil] what the complainant said was stolen and that he did not recall whether [Stencil] also had an additional $70, a cell phone, a wallet and a set of keys on him. On redirect, the prosecutor had him point out that, tacitly implying it was standard procedure, anything not reported as stolen, such as money in a wallet in particular, would be considered [Stencil]'s personal property and be left on him, presumably to be taken from him, documented and stored while he was being incarcerated, as is the well-known common procedure.

Trial Court Opinion, 5/5/2018, at 2-11 (footnote and record citations omitted).

Stencil was charged with multiple offenses related to the incident. As stated above, on August 28, 2014, a jury convicted him of burglary and theft by unlawful taking. On April 23, 2015, the court sentenced him to a term of three-and-a-half to seven years' imprisonment for the burglary offense, with credit for time served.[2] On April 24, 2015, Stencil filed a motion for reconsideration of his sentence and a motion for a new trial. On June 15,

_____

[2] The theft crime merged for sentencing purposes.

2015, the court denied both post-sentence motions. Two days later, Stencil filed this appeal.[3]

In his sole issue on appeal, Stencil argues the verdict was against the weight of the evidence.[4] Specifically, he states,

> Officer Davies's testimony at trial, and present-sense description of the burglar on police radio proved the burglar was "clean shaven." However, the Commonwealth admitted a photograph that fairly and accurately depicted Mr. Stencil at the time of his arrest, and which established he was not "clean shaven." Had Mr. Stencil been the burglar, Officer Davies would not have described the burglar as "clean shaven." He also wasn't wearing the dark hoodie, and gloves worn by the burglar.

Stencil's Brief at 12-13. Moreover, Stencil contends: (1) the court should not have relied on the officers' identification testimony "because it is generally accepted in the scientific community that there is a lack of correlation between witness statements of confidence in an identification and the accuracy of the identification;"[5] (2) the identification testimony should

_____

[3] On September 30, 2015, the trial court ordered Stencil to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Stencil filed a concise statement on October 21, 2015, raising his weight claim. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on May 5, 2016.

Stencil filed several extensions of time and supplemental concise statements. Nonetheless, Stencil preserved the weight claim in the October 21st concise statement.

[4] Stencil properly preserved his challenge to the weight of the evidence by raising it in a post-sentence motion. *See* Pa.R.Crim.P. 607(A).

[5] Stencil's Brief at 15.

- 13 -

have been accepted with caution because there were no statements made at trial regarding "the burglar's eyes, nose, lips, mouth, ears, jawbone, cheekbones, forehead, eyebrows, eyelashes, skin tone, scars, or other distinguishing marks;"[6] (3) the SEPTA tokens and two dollar bill found on Stencil are common and not unique in identifying characteristic and therefore, carry little evidentiary weight;[7] and (4) evidence of Stencil's flight alone was insufficient to establish guilt.[8]

When a defendant challenges the weight of the evidence, he "concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." *Commonwealth v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013), *cert. denied*, 134 S.Ct. 1792 (U.S. 2014). Our review of a weight claim is well-established:

> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so

---

[6] *Id.* at 16.

[7] *Id.* at 16-17.

[8] *Id.* at 18.

clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock one's conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence. An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Rosser*, 135 A.3d 1077, 1090 (Pa. Super. 2016) (*en banc*), *quoting* *Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015), *appeal denied*, 125 A.3d 1196 (Pa. 2015) (citations omitted).

Here, the trial court found the following:

[Stencil] simply asked the court to grant him a new trial based upon his slanted self-serving characterization of the police officers' testimony as having "cast doubt upon whether the person seen by the police inside the burglarized house was Mr. Stencil, who was later stopped in the neighborhood." The officers' testimony was anything but doubtful. They both had a clear unfettered view inside the house and plenty of time to get a good look at [Stencil]'s face. Counsel's attempt to belittle the quality of their observations by harping on the fact that one of them did not mention that he had facial hair in his later recountings, and the other did not notice his facial hair when she first briefly glimpsed him, are red herrings. Given [Stencil]'s very light beard and mustache, even trained and experienced police officers would be excused from not noticing "some" facial hair on an African American male fleeing from a house at 5:00 o'clock in the morning. That same training and experience would be just as likely to cause them to readily grasp the more prominent facial features and their color, sizes and shapes. Claiming that the identifications were flawed by the fact that the officers lost sight of him, which, by all the officer's descriptions, amounted to mere moments, ignores the facts that [Stencil] was obviously trying to flee and was caught with the goods, particularly the positively identified two dollar bill and the unusual number of bags of tokens. He was not "later stopped" while he just happened to be walking in his neighborhood; he

- 15 -

was seen fleeing from the rear of a house where a burglary in progress had just been reported, immediately pursued, seen jumping into and out of back yards and an alleyway, which was walled off at one end with a locked gate at the other, and was found very quickly trying to hide in a backyard not his own.

…

[Stencil] was not "merely" present at the scene, he was seen committing the crime itself: being in someone else's house without their permission. In that situation, flight is definitely more evidence of guilt and may be properly considered as such by the fact finder, together, of course, with the officers' confidence in the accuracy of their observations and recollections.

…

So much for the relevance of counsel's allusion to the fact that [Stencil] was not wearing gloves when he was finally apprehended. And the conclusion that it would be much more likely that a woman would keep five bags of tokens in her handbag is a much more logical one to draw than that a man would have all of them, some of which had apparently been opened and some of the tokens taken out, in his pocket while strolling through his neighborhood. "Similarly, evidence that appellant was in possession of property stolen in not just one but several burglaries and comprising several different kinds of goods was relevant not simply to prove a general criminal propensity, but considerably to increase the likelihood of guilt – or absence of mistake – with regard to each separate possession, and therefore admissible in a separate trial of each offense." *Commonwealth v. Lasch*, 464 Pa. 573, 347 A.2d 690, 698 (1975) (affirmance by equally divided court, the dissenters disagreeing with the lower Courts' decisions and the other Justices' view on the main issue in the case, that the separate burglary cases were properly tried jointly). In sum, a clear reading of the officers' direct identification testimony, together with all of the corroborating evidence, leaves no question that the Commonwealth proved its case beyond a reasonable doubt.

…

Needless to say, the court does not see any flaws or contradictions in the officers' testimony. The facial hair and the momentary loss of observation do not cast any doubt on the integrity and reliability of their observations and to claim that they do, in the face of all the other corroborating evidence, is a grossly unfounded exaggeration. The fact that the jury found the officers credible does not shock the court's conscience; it doesn't even cause the slightest twinge.

Trial Court Opinion, 5/5/2018, at 13-17.

We agree with the court's well-reasoned analysis. Stencil's argument consists largely of claims that the greater weight of evidence fell in his favor. We remind Stencil that credibility determinations are within the sole province of the fact finder. **See Rosser**, **supra**. Moreover, we note that while Stencil was not "clean shaven" at the time of his arrest, one can easily see that his beard and mustache were subtle and therefore, would not stand out at 5:30 a.m. on a December morning. **See** Stencil's Brief, Exhibit C. Furthermore, Officer Hudson apprehended Stencil shortly after observing him inside the victim's home. The officer only lost sight of Stencil for several seconds while he chased him down a back alley but ultimately found him behind an air conditioning unit in a backyard that was not his own. Stencil was also found with items substantially similar to what was stolen from the victim's house. Of importance, the victim identified the two-dollar bill found on Stencil as the exact one she was missing. **See** N.T., 8/27/2014, at 60. As such, we conclude Stencil has failed to establish the trial court abused its discretion in determining the verdict was not against the weight of the

evidence.[9]  ***See Rossner***, ***supra***.  Accordingly, his sole argument on appeal fails.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/18/2017

---

[9]  To the extent Stencil touches upon a sufficiency argument with his claim that flight alone does not establish guilt, we have no hesitation in concluding the totality of the circumstances demonstrated Stencil committed the crimes.  ***See Commonwealth v. Melvin***, 103 A.3d 1, 39-40 (Pa. Super. 2014) (providing standard of review for a sufficiency of the evidence argument).