J-A12032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
JOVAR JUWAN JACKSON :
:
Appellant : No. 591 MDA 2020

Appeal from the Judgment of Sentence Entered January 2, 2020
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0001488-2019

BEFORE: LAZARUS, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED: AUGUST 19, 2021**

Jovar Juwan Jackson ("Jackson") appeals from the judgment of sentence imposed following his conviction of two counts of robbery, and one count of criminal conspiracy.[1] We affirm.

In its Opinion, the trial court set forth the relevant factual and procedural history, which we adopt for the purpose of this appeal. *See* Trial Court Opinion, 5/21/20, at 1-7.

Jackson now raises the following issues for our review:

I. Two of the Commonwealth's witnesses testified that their discussions with the prosecutor affected their testimony. … During [] Jackson's cross-examination of the second witness, the Commonwealth objected and the trial court limited [defense] counsel's questioning. … Did the trial court err when:

---

[1] *See* 18 Pa.C.S.A. §§ 3701(a)(1)(9), 903.

a. The hearsay rules, on which the prosecutor rested her objection, would have allowed the witness to answer; and

b. It prevented the jury from forming a significantly different impression of the witness's credibility and violated the Confrontation Clause?

Brief for Appellant at 4.

We will address Jackson's issues together, as they are related. Jackson asserts that the trial court "improperly cut off [Jackson's] cross-examination." *Id.* at 16. First, Jackson claims that the trial court erred in sustaining the Commonwealth's hearsay objection, and that the restriction of cross-examination contributed to the verdict. *Id.* at 16, 19. According to Jackson, Todd Coyle ("Coyle") and William Reiss ("Reiss"), who heard the gunshot and saw people fleeing the scene from across the street, changed their testimony at trial. *Id.* at 17. Jackson argues that defense counsel asked Reiss[2] whether his discussions with the prosecutor influenced his trial testimony regarding his observation of two or three people running from Hilary Gbotoe's ("Gbotoe") apartment, despite previously having told police that he had observed four men. *Id.* at 17-18; *see also id.* (claiming that "[t]he obvious point of the question was not to prove the number of people that ran from the apartment; it sought details of the witness's preparation to determine whether the

---

[2] In his Argument, Jackson fails to identify the witness to whom the challenged objection was directed. From our review of Jackson's Statement of the Case and the trial transcripts, it appears that this exchange occurred during cross-examination of Reiss. *See* N.T., 10/10/19, at 379-87.

prosecutor corrupted his recollection."). Jackson contends that this alleged error contributed to the verdict, as "[t]here is no understating the importance of the credibility of the 'two independent witnesses across the street.'" *Id.* at 19.

Second, Jackson asserts that, by limiting his cross-examination, the trial court also violated his rights under the Confrontation Clause. *Id.* at 20. Jackson claims that he should have been permitted to cross-examine Commonwealth witnesses on matters affecting credibility. *Id.* at 21. Specifically, Jackson argues that

> [] Jackson's questioning—if the trial court had not intervened— would have left the jury with a significantly different impression of [] Reiss's credibility. [] Reiss indicated that his discussions with the prosecutor changed his recollection. He admitted that he told the police that he had seen four people flee and another person stay in the apartment after closing the door. [Reiss] admitted that his police statement did not include the "minimum number" verbiage that he used during his direct examination. He further admitted that he used that verbiage as a result of his conversations with the prosecutor before trial. Further exploration into what the prosecutor had told him would have provided the jury with an explanation of why [] Reiss'[s] recollection had changed.

*Id.* at 22-23 (citations to record omitted). Jackson asserts that both Reiss and Coyle changed their respective accounts after meeting with the

- 3 -

prosecutor. *Id.* at 24, 27.[3]

In its Opinion, the trial court set forth this Court's standard of review and the relevant law, addressed Jackson's claim, and concluded that it lacks merit. *See* Trial Court Opinion, 5/21/20, at 7-12. Specifically, the trial court stated that "the court's ruling did not prevent counsel from impeaching Reiss, and it did not prevent the jury from assessing his credibility based on the potential discrepancies between his trial testimony and what he initially told police." *Id.* at 10. The trial court also stated that it was clear, even without the proffered testimony, that the jury would "understand that counsel was asking whether the prosecutor got the witness to change their statement." *Id.* Additionally, as the trial court pointed out, Coyle testified that during his later conversation with the prosecutor, he clarified that there were three people running from the scene, but the fourth man remained inside the house. *Id.* at 9 n.7; *see also* N.T., 10/9/19, at 354-59. According to the trial court, even if its evidentiary ruling was erroneous, the resulting prejudice was *de minimus*. *See* Trial Court Opinion, 5/21/20, at 10-12. We agree with the trial

---

[3] Jackson's Confrontation Clause challenge is waived. As Jackson acknowledges in his brief, defense counsel did not raise a challenge based on the Confrontation Clause in arguing against the Commonwealth's objection. Brief for Appellant at 20 n. 1; *see also Commonwealth v. Rosser*, 135 A.3d 1077, 1087 (Pa. Super. 2016) (finding the appellant's Confrontation Clause challenge to the preclusion of cross-examination waived, because he first raised it in his concise statement); Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

court's reasoning, as set forth in its Opinion, and affirm on this basis. ***See id.***

at 7-12. Accordingly, we can grant Jackson no relief on his claims.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/19/2021

# IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
## CRIMINAL

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | |
| | : | No. 591 MDA 2020 |
| vs. | : | |
| | : | CP-36-CR-0001488-2019 |
| JOVAR JUWAN JACKSON | : | |

## PA. R.A.P. 1925 OPINION

BY TOTARO, J.

Presently before the Superior Court of Pennsylvania is an appeal filed by Jovar Juwan Jackson ("Appellant") from the judgment of sentence imposed on January 2, 2020, as finalized by the denial of a post-sentence motion on March 2, 2020. For the reasons stated herein, the appeal should be denied.

## BACKGROUND

On October 16, 2018, Lancaster City Bureau of Police ("LCBP") officers responded to 3 South Lime Street in Lancaster City for a reported shooting and found Hilary Gbotoe ("Gbotoe") suffering from a gunshot wound to the abdomen. *See* Police Criminal Complaint and Affidavit of Probable Cause. Gbotoe was transported to the hospital where he received emergency life-saving surgery for his wound. *Id.* Gbotoe later told police he was staying with a friend named Jose Aponte ("Aponte") when three males came to the residence to collect $10,000. *Id.* Gbotoe stated that he, Aponte and the residence were searched and no money was found. *Id.* Gbotoe was then shot in the abdomen and the suspects fled. *Id.* Gbotoe identified Jamal Newman ("Newman"), Clifton Hunter ("Hunter"), and Appellant as the three suspects involved. *Id.*

On October 20, 2018, Appellant was charged with conspiracy to commit homicide (Gbotoe), aggravated assault (Gbotoe), conspiracy to commit aggravated assault (Gbotoe), two

counts of robbery, and one count of conspiracy to commit robbery (Gbotoe and Aponte).[1] *See* Police Criminal Complaint.

The case proceeded to a consolidated trial against Appellant and Hunter on October 9, 2019. (Notes of Testimony at 12-13) ("N.T.").[2] Officer J. Hatfield ("Hatfield"), LCBP, testified that on October 16, 2018, at 7:42 p.m., he was dispatched to 3 South Lime Street for a possible shooting. *Id.* at 404. Upon arrival, Hatfield heard someone moaning for help inside, discovered the door was locked, and knocked on the door. *Id.* at 405, 419. When no one answered, Hatfield forced entry into the apartment. *Id.* at 405. Once inside, Hatfield saw a male standing inside the door and another male laying on the floor who stated he was shot. *Id.* at 406-07.

Officer Timothy Sinnott ("Sinnott"), LCBP, testified that he also responded to the scene, saw Hatfield kick open the door, and saw a male named Jose Aponte standing inside near the door. (N.T. at 432-34, 449-50). Aponte was removed from the residence. *Id.* Sinnott saw Gbotoe laying on the ground groaning and clutching his abdomen. *Id.* at 435, 447. When Sinnott asked who shot him, Gbotoe said that Jamal Newman and two other subjects came to the residence, they said he owed them money, and Jamal Newman shot him. *Id.* at 436-38. Gbotoe did not know the names of the two other people but knew them from school. *Id.* at 438.

Detective Robert Whiteford ("Whiteford"), LCBP, testified that he created a photo array on October 17, 2018 containing a picture of Jamal Newman and took it to the hospital to show Gbotoe. (N.T. at 608-10). Gbotoe did not identify the suspect from the array. *Id.* at 610-12.

---

[1] 18 Pa.C.S.A. § 903(a); Pa.C.S.A. § 2702(a)(1); Pa.C.S.A. § 903(a); 18 Pa.C.S.A. § 3701(a)(1)(i); and 18 Pa.C.S.A. § 903(a); respectively.

[2] The Commonwealth did not attach for trial counts 1 (conspiracy/homicide), 2 (aggravated assault), or 3 (conspiracy/aggravated assault) of the criminal Information. (N.T. at 80).

However, Gbotoe recalled having a conversation with the person he knew as Jamal on Facebook prior to the robbery, so Whiteford searched Gbotoe's Facebook profile of friends and located a person named Jamel Nesmith ("Nesmith"). *Id*. at 613-14, 624. Whiteford then created a photo array containing the photo of Nesmith and Gbotoe immediately identified Nesmith as the person involved. *Id*. at 614. Gbotoe informed Whiteford that three people were involved in the incident and they searched Aponte, Gbotoe, and the apartment looking for $10,000. *Id*. at 625-29. Jamal was not the shooter, but Nesmith ordered another suspect to shoot him. *Id*. at 625, 629-30.

Gbotoe testified that he was staying with Jose Aponte at 3 South Lime Street on October 16, 2018, when he was contacted by a friend named Jamel Nesmith who wanted to buy "some pounds of weed." (N.T. at 249-52). Later that evening, Nesmith showed up at the residence with Appellant and Hunter. *Id*. at 252-54. When they entered the residence, Nesmith asked about the pounds and Gbotoe stated he was dry. *Id*. at 255. Appellant then accused Gbotoe of lying and started searching the residence looking for weed. *Id*. at 255-56. Gbotoe stated that while he was texting on his phone Hunter asked who he was texting and Nesmith said to shoot him. *Id*. at 256-58. Gbotoe saw Hunter pull a gun out of his waistband before shooting him in the abdomen. *Id*. at 258. Appellant was in the bedroom with Aponte when the shooting occurred. *Id*. at 322.

After Gbotoe was shot in the abdomen, Hunter pointed the gun at his head. (N.T. at 258). However, Appellant yelled that Aponte had a gun and Aponte came rushing out of his bedroom with a gun. *Id*. at 258-59. Appellant and Hunter took off running when they saw Aponte with the gun. *Id*. at 261. When police arrived, Gbotoe gave them the name of Jamal Newman as the person who shot him because he had only met Appellant one week before the incident and could not remember the names of those involved. *Id*. at 263. The only name he knew was Jamal. *Id*.

3

at 264-66. Gbotoe later gave police more detailed information about what happened, stating that Jamal was not the shooter and he forgot Jamal's last name. *Id.* at 265-66. Gbotoe then identified Nesmith from a photo array as the person he knew to be Jamal, Appellant from a photo array as the non-shooter, and Hunter from a photo array as the shooter. *Id.* at 266-71.[3]

Detective Thomas Ginder ("Ginder"), LCBP, testified that he apprehended Nesmith on October 19, 2018. (N.T. at 647). During an interview at the police station, Nesmith was visibly upset and crying. *Id.* Nesmith then identified the two other individuals involved, and police compiled photo arrays of those individuals to show Gbotoe. *Id.* at 648. Ginder showed the arrays to Gbotoe at the hospital and Gbotoe picked out the photographs of Appellant and Hunter as those involved. *Id.* at 648-52. Gbotoe identified Hunter as the person who shot him. *Id.*

Nesmith testified that he knew Appellant, Hunter, and Gbotoe. (N.T. at 122-25). On October 16, 2018, Nesmith contacted Gbotoe to buy a quarter pound of weed. *Id.* at 125, 128, 130.[4] Gbotoe responded that he did not have the whole amount but was going to see Jose and would be back in touch. *Id.* at 130. Appellant was present as Nesmith attempted to set up the drug deal and Hunter arrived shortly thereafter in a vehicle. *Id.* at 130-31.

Nesmith stated that he and Appellant got into Hunter's car and they drove to Jose's house to see if he could get the marijuana. (N.T. at 134). They parked in an alleyway, walked to the

---

[3] On cross-examination, Gbotoe acknowledged writing in a Facebook post on November 7, 2018 that Jamel shot him, but stated the post was a lie. (N.T. at 298-301). Gbotoe admitted he was a drug dealer for profit. *Id.* at 302. Gbotoe also stated he was currently facing a charge of criminal trespass which occurred on August 27, 2018, and possession of a firearm which occurred on January 19, 2019, for which the Commonwealth had not offered him any consideration in exchange for his cooperation as a victim in this case. *Id.* at 292-94. In fact, Gbotoe was currently incarcerated on the other criminal charges when he testified at trial and had been incarcerated for the past eight months. *Id.* at 305-06.

[4] The Commonwealth introduced as Exhibit #1 a Facebook message dated October 16, 2018, showing Nesmith contacting Gbotoe at 6:31 p.m. (N.T. at 129).

4

house, and Appellant knocked on the door. *Id.* at 136-37.[5] Upon entering the residence, Nesmith saw Gbotoe sitting in a chair on his phone and Jose was standing in the kitchen. *Id.* at 141-42. When Gbotoe stated he did not have the weed, Appellant asked Gbotoe where the money was located. *Id.* at 142-45, 185. Hunter then told Gbotoe to get off his phone and Gbotoe responded by saying he was texting somebody to try and make a drop. *Id.* at 145. Hunter walked up to Gbotoe to grab the phone, Gbotoe moved the phone away, Hunter reached into his hoodie, and Nesmith saw Hunter pull something out. *Id.* at 145-46. Nesmith did not see the gun, but he instantly heard a gunshot as he took off out the door. *Id.* at 146.

Nesmith stated he was arrested on October 19, 2018, and was taken to the police station. (N.T. at 152).[6] While there, Nesmith identified Appellant and Hunter as the two individuals he was with during the incident, specifically identifying Hunter as the shooter. *Id.* at 154-57.

Sergeant Thomas Cole ("Cole"), LCBP, testified that he responded to the scene and found Aponte sitting outside on a cement slab. (N.T. at 468). Several small baggies containing white pills later determined to be Alprazolam were also found outside. *Id.* at 469. Empty baggies matching the ones found outside were located on the kitchen table. *Id.* at 470.

---

[5] The Commonwealth introduced as Exhibit #3 a photograph showing three individuals walking towards Jose's house, and Nesmith identified the individuals as Appellant, Hunter, and himself. (N.T. at 138-39). Detective Ginder testified he retrieved Lancaster Safety Coalition video footage from cameras in the area and produced still shots from the video. *Id.* at 653-54. One still shot was Commonwealth Exhibit #3, which showed three individuals arriving in the area of South Lime Street at 7:35 p.m. *Id.* at 655, 663-64. The shooting was reported at 7:42 p.m. *Id.* at 661. Additional video at 7:42 p.m. depicts two individuals walking or running from the scene in different directions. *Id.* at 655-57, 663-66.

[6] Nesmith testified he did not intend to rob Gbotoe when he went to the house but rather intended to buy weed so he could re-sell it. (N.T. at 169, 180). Nevertheless, Nesmith was charged with two counts of robbery, aggravated assault, conspiracy to commit aggravated assault, and attempted homicide. *Id.* at 169-70, 198-99. Nesmith stated no promises had been made to him in return for his testimony, and he acknowledged a retail theft conviction from 2015. *Id.* at 157, 171.

Michael Bradley ("Bradley") responded to the crime scene the evening of October 16, 2018 as an evidence specialist for LCBP. (N.T. at 516, 521). Bradley stated he took photographs of the scene and located drugs just outside the front door which caused him to suspect a robbery had occurred. *Id.* at 522, 525, 582-83. He also recovered a revolver centered toward the top of the bed in the bedroom. *Id.* at 526-28. Bradley determined the gun was not operable because it was missing a trigger, a trigger guard, a firing pin, and a hammer. *Id.* at 530-32, 586. No missing pieces to the firearm were found at the crime scene. *Id.* at 588.

Dr. John Lee ("Lee"), was the backup trauma surgeon on October 16, 2018. (N.T. at 215). According to Lee, Gbotoe sustained five separate areas of injury to his small intestine, and three damaged areas were removed because they were beyond repair. *Id.* at 596. As such, Gbotoe is at risk of complications such as intestinal blockage for the rest of his life. *Id.* at 601. The bullet was not removed because the final location of the bullet was buried deep behind Gbotoe's abdomen and it was not a safe procedure. *Id.* at 601-02. Gbotoe suffered a life-threatening injury, and "most certainly would have died" without the surgery. *Id.* at 595-96.

On January 6, 2019, Officer Joshua Aziza ("Aziza"), LCBP, conducted a traffic stop in Lancaster City for a heavy window tint violation. (N.T. at 734). Aziza testified that he was aware of an arrest warrant for Appellant from October 2018. *Id.* When the car pulled over, the passenger door immediately opened, Appellant got out of the vehicle, and he started running away. *Id.* at 735. Aziza gave chase but Appellant was able to get away. *Id.* at 736.

On March 8, 2019, Detective Nathan Nickel ("Nickel"), LCBP, received information about Appellant's location. (N.T. at 739). Nickel testified that when he went to the front door of the residence, officers to the rear of the residence announced that Appellant had just exited the

rear door and was fleeing from officers through rear yards. *Id.* at 740. After jumping fences, Appellant ran into a blocked foot alley where he was taken into custody. *Id.* at 740-41.

On October 16, 2019, Appellant was found guilty on all counts and a pre-sentence investigation report ("PSI") was ordered. (N.T. at 956, 973). On January 2, 2020, the court sentenced Appellant on count 4 (robbery of Gbotoe): 7-14 years in the state correctional institution ("SCI"); count 5 (robbery of Aponte): 5-14 years in SCI; and count 6 (conspiracy to commit robbery of Gbotoe and Aponte): 6-12 years in SCI. (Notes of Testimony, Sentencing at 36) ("N.T.S."). The sentences on the robbery convictions were made concurrent to each other, while the sentence on the conspiracy charge was made consecutive to the robbery sentences. *Id.* at 37. The aggregate sentence was 13 to 26 years incarceration in SCI. *Id.* The court made Appellant eligible for any programs in SCI to address his substance abuse. *Id.* at 36-37.

On January 27, 2020, Appellant filed a post-sentence motion challenging the weight of the evidence and the sentence imposed. *See* Post-Sentence Motion. The motion was denied on March 2, 2020. *See* Order, 3/2/20. On March 30, 2020, Appellant filed a Notice of Appeal. A Concise Statement of matters complained of on appeal ("Statement") was filed on April 21, 2020, questioning whether the trial court (1) erred in limiting trial counsel's questioning of a witness on cross-examination, and (2) abused its sentencing discretion. *See* Statement. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

## DISCUSSION

### The Trial Court did not err in ruling on trial counsel's questioning of a witness.

Appellant first argues the trial court erred in limiting trial counsel's questioning of a Commonwealth witness. *See* Statement. More specifically, Appellant claims the hearsay rules on

7

which the prosecutor rested her objection would have allowed the witness to answer and the trial court's ruling prevented the jury from forming a significantly different impression of the witness' credibility, thus violating the Confrontation Clause. *Id.*

William Reiss ("Reiss") testified that on October 16, 2018, he was going out to dinner with a friend named Todd Coyle ("Coyle") when he heard a gunshot across the street from his residence and saw a minimum of three people exit an apartment. (N.T. at 368, 371). One person went north and at least two went south. *Id.* at 372. Reiss could not identify the individuals and did not see anyone carrying a gun. *Id.* at 374, 378-79. Reiss also saw the male who rented the apartment walk up to the door, look out, and then shut the door from the inside. *Id.* at 374-75.

On cross-examination, Reiss acknowledged telling police the night of the incident that he saw four people running. (N.T. at 380). When asked whether he had a conversation with police or the prosecutor that affected his memory, Reiss stated he spoke to the prosecuting attorney approximately one week before the trial. *Id.* at 381-82. Counsel then asked whether the prosecutor said anything in reference to the number of people identified as running, at which time the prosecutor objected based on hearsay and because the witness stated he was testifying from his own memory. *Id.* at 383. During a sidebar discussion the following exchange occurred:

COUNSEL: - - the police report itself says what he says to the police even though he doesn't - - we don't have a copy, for whatever reason, of his signed statement, but the police report itself says what he said to police.

COURT: Then question him on it and ask him what he remembers.

COUNSEL: And I can also question him on any person trying to affect his memory.

COURT: Well, then ask that question.

COUNSEL: Well, that's what I was asking.

COURT: No. No. You were asking for the - - specific contents of the conversation, which is what the objection to the hearsay was.

COUNSEL: Because this goes to his state of mind and what affected it.

8

COURT: Well, then ask that question, all right, without asking what specific -

COUNSEL: Again, we have to get some foundational things because - foundational things just saying, did anybody affect it? He may not even know that, if it did. So I'm asking foundational things to see what the effect may be.

DA: Just ask him if anything has affected his memory.

COUNSEL: Well, as I just said, he may not even particularly know that it did, so that's why I'm asking foundational things.

DA: How is he not going to know?

COURT: No. No. You can ask him if, in this conversation, anything was said that caused him to change his recollection. I mean, that's the gist of what you're doing. Just ask that. Let's cut right to the chase.

COUNSEL: So I'm just - - if you'll note my objection to the limitation.

(N.T. at 385-86).[7]

The trial court has broad discretion in the conduct of cross-examination, especially on collateral matters. *Commonwealth v. Smyrnes*, 154 A.3d 741, 754 (Pa. 2017). A court may exclude evidence where the probative value is outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. The Superior Court may not reverse the trial court's discretion on the scope or limits of cross-examination absent a clear abuse of discretion or an error of law. *Commonwealth v. Washington*, 63 A.3d 797, 805 (Pa. Super. 2013).

When reviewing a trial court's ruling, the standard is one of deference. *Commonwealth v. Belknap*, 105 A.3d 7, 9 (Pa. Super. 2014). A finding of abuse of discretion may not be made "merely because an appellate court might have reached a different conclusion, but requires a

---

[7] Coyle testified that he heard a loud crack when he was picking up Reiss and saw two men run south past him down the street and another run north. (N.T. at 345-48). Coyle saw a fourth person inside the house shut the door. *Id.* at 348. Coyle could not identify any of the individuals. *Id.* On cross-examination, Coyle admitted telling police the evening of the incident that four males exited the apartment and one male ran north while the other three ran south, but stated he clarified the number of people running after going over the information with the Commonwealth attorney. *Id.* at 350-51, 355.

9

result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Laird*, 988 A.2d 618, 636 (Pa. 2010). To constitute reversible error, an evidentiary ruling must not only be erroneous but also harmful or prejudicial to the complaining party. *Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa. Super. 2012).

In the present case, the court clearly stated that defense counsel would be permitted to continue asking questions about the effect on the witness of what the prosecutor said, which was precisely what counsel stated she wished to do. The court did not limit counsel's ability to establish on cross-examination that Reiss told police he saw four people running from the apartment and the number may have changed after he spoke to the prosecuting attorney. Thus, the court's ruling did not prevent counsel from impeaching Reiss, and it did not prevent the jury from assessing his credibility based on the potential discrepancies between his trial testimony and what he initially told police. Moreover, the testimony was essentially cumulative because the jury did not need to hear what the prosecutor told the witness to understand that counsel was asking whether the prosecutor got the witness to change their statement. Because the ruling was not erroneous and was not harmful or prejudicial to Appellant, this claim lacks merit.

Assuming, *arguendo*, the testimony was improperly excluded, an erroneous ruling on an evidentiary issue does not automatically entitle a defendant to relief. *Commonwealth v. Yockey*, 158 A.3d 1246, 1254 (Pa. Super. 2017). "[A]n evidentiary error of the trial court will be deemed harmless on appeal where the appellate court is convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict." *Commonwealth v. Manivannan*, 186 A.3d 472, 480 (Pa. Super. 2018). The harmless error doctrine reflects the reality that an accused is entitled

10

to a fair but not a perfect trial. *Commonwealth v. Green*, 162 A.3d 509, 519 (Pa. Super. 2017). An error is harmless where:

> (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial [e]ffect of the error so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Passmore*, 857 A.2d 697, 711 (Pa. Super. 2004).

In the present case, any prejudice was de minimis. Furthermore, the properly admitted evidence of guilt was so overwhelming and any prejudicial effect so insignificant by comparison that the testimony in question could not have contributed to the verdict.

Within days of the incident, Gbotoe identified Appellant from a photo array as one of the three individual involved in the robbery and shooting. Gbotoe then testified at trial and positively identified Appellant as the person who started searching the residence looking for weed after Gbotoe stated he did not have any marijuana.

Three days after the incident, co-defendant Nesmith also identified Appellant as one of the persons involved in the incident. Nesmith then testified at trial that Appellant was present as Nesmith attempted to set up a drug deal with Gbotoe, Appellant went with him to Gbotoe's apartment, Appellant knocked on the door, and Appellant asked Gbotoe where the money was located after Gbotoe stated he did not have any weed.

Video footage from a surveillance camera corroborated Nesmith by showing three individuals walking towards Gbotoe's apartment on the date in question. Nesmith identified the individuals as Appellant, Hunter, and himself.

11

Three months after the shooting, Appellant fled from a police officer after being pulled over for a window tint violation. On March 8, 2019, Appellant fled from police out the rear door of a residence and ran through rear yards until he reached a blocked foot alley where he was taken into custody. This conduct by Appellant demonstrated a consciousness of guilt.

Because the properly admitted and uncontradicted evidence of guilt was overwhelming and the prejudicial effect of the error so insignificant by comparison, the error could not have contributed to the verdict and the claim must fail.

### The Trial Court did not abuse its discretion when imposing sentence.

Appellant next suggests the trial court may have abused its discretion by imposing an excessive sentence because the court considered his juvenile case evaluations and reports. *See* Statement.

An appellant's right to appeal the discretionary aspects of his sentence is not absolute. *Commonwealth v. Fiascki*, 886 A.2d 261, 263 (Pa. Super. 2005). Before a challenge will be heard the appellant must show there is "a substantial question that the sentence imposed is not appropriate under the Sentencing Code." *Id.*; 42 Pa.C.S.A. § 9781(b). To establish a substantial question, an appellant must show that the actions taken by the sentencing court are inconsistent with the sentencing code or contrary to the fundamental norms that underlie the sentencing process. *Fiascki*, 886 A.2d at 263. A bald allegation of excessiveness is not sufficient to establish a substantial question. *Commonwealth v. Mouzon*, 812 A.2d 617, 623 (Pa. 2002).

In the present case, trial counsel objected at sentencing to information in the PSI about Appellant's juvenile history that expressed opinions about Appellant, including psychological and placement reports. (N.T.S. at 2-11). Counsel claimed Appellant was being denied his right

12

to confrontation because he would not have the opportunity to question any person who wrote or relied on the reports to make any conclusions about Appellant. *Id.* at 3, 9. Counsel also claimed the documents do not fit as business records because no custodian was present to testify. *Id.* at 9. Counsel was unable to provide any relevant legal authority for her position. *Id.* at 6-9.

In response, the court noted that Appellant and his counsel had the opportunity to challenge any inaccuracies in the reports when they were presented in juvenile court. (N.T.S. at 5). Moreover, the court was prepared at that time to give Appellant and counsel an opportunity to refute anything in the PSI that was inaccurate. *Id.* at 10. However, counsel and Appellant declined to refute any information contained in the juvenile reports. *Id.* at 10-11.

In *Commonwealth v. Eldred*, 207 A.3d 404 (Pa. Super. 2019), the Superior Court held that due process allows a court to consider any information during a sentencing proceeding, even if it would not be admissible under the evidentiary rules, provided "the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence." *Id.* at 408. The defendant also had no constitutional confrontation right to call the victim as a witness at a sentencing hearing. *Id.* at 410.

In *Commonwealth v. Carrillo-Diaz*, 64 A.3d 722 (Pa. Super. 2013), the Superior Court stated that an essential element of a PSI report includes a full description of any prior criminal record, a psychological or psychiatric report, and reports from clinics, institutions and other social agencies with which the offender has been involved. *Id.* at 725-26. In *Commonwealth v. Bonner*, 135 A.3d 592 (Pa. Super. 2016), the Superior Court cited the defendant's juvenile behavior in affirming the lower court's sentence by noting that the defendant began his string of criminal behavior at the age of 12, was routinely involved in the juvenile justice system,

13

continually violated the terms of supervision, and rejected his chance at rehabilitation in the juvenile justice system. *Id.* at 604.

In this case, Appellant asserts the court may have abused its discretion by imposing an excessive sentence because the court considered Appellant's juvenile case evaluations and reports. However, the court was permitted to do so. Therefore, Appellant has failed to establish a substantial question by showing that the actions taken by the sentencing court were inconsistent with the sentencing code or contrary to the fundamental norms that underlie the sentencing process, and his challenge to the discretionary aspects of his sentence should be denied.[8]

Assuming, *arguendo*, Appellant has raised a substantial question, the court will address this claim on the merits. In determining an appropriate sentence, the court must consider a defendant's age, character, personal characteristics, prior criminal record, circumstances of the offense, and potential for rehabilitation. *Commonwealth v. Clemat*, 218 A.3d 944, 959 (Pa. Super. 2019). The goal of the sentencing code is to ensure that the sentence imposed should call for confinement consistent with protection of the public, the gravity of the offense as it relates to impact on the life of the victim and community, and rehabilitative needs of the defendant. *Commonwealth v. Mouzon*, 812 A.2d 617, 620 (Pa. 2002) (quoting 42 Pa.C.S.A. § 9721(b)).

The general standard of review when considering a challenge to the discretionary aspects of a court's sentence has been established by the Superior Court as follows:

---

[8] "Generally speaking, [a trial] court's exercise of discretion in imposing consecutive as opposed to concurrent sentences is not viewed as raising a substantial question that would allow the granting of allowance of appeal." *Commonwealth v. Mastromarino*, 2 A.3d 581, 586 (Pa. Super. 2010). Moreover, a bald claim of excessiveness due to consecutive sentences within the standard range of the guidelines will not raise a substantial question unless the application of the guidelines would be clearly unreasonable resulting in an excessive sentence. *Commonwealth v. Diehl*, 140 A.3d 34, 45 (Pa. Super. 2016).

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Griffin*, 65 A.3d 932, 937 (Pa. Super. 2013). In discussing the rationale behind such broad discretion to the sentencing court and the deferential standard of appellate review, the Pennsylvania Supreme Court has stated:

[T]he sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. . . . Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court.

*Commonwealth v. Walls*, 926 A.2d 957, 961-62 (Pa. 2007); *see also Commonwealth v. Jones*, 613 A.2d 587, 591 (Pa. Super. 1992) (sentencing court is in better position to view a defendant's character, display of remorse, defiance or indifference, and effect and nature of the crime).

The appellate court should affirm the trial court's sentence unless it finds the guidelines were erroneously applied, a guideline sentence is "clearly unreasonable," or a sentence outside the guidelines is "unreasonable." *Fiascki,* 886 A.2d at 263; 42 Pa.C.S.A. § 9781(c). To determine if a sentence is unreasonable, Appellate courts must consider the circumstances of the offense, background and character of the defendant, opportunity of the trial court to observe the defendant, the trial court's review of a presentence investigation, findings upon which the sentence was based, and sentencing guidelines. *Commonwealth v. Moore*, 617 A.2d 8, 12 (Pa.

15

Super. 1992); 42 Pa.C.S.A. § 9781(d). In *Walls,* the Supreme Court did not define unreasonableness but stated "we are confident that rejection of a sentencing court's imposition of sentence on unreasonableness grounds would occur infrequently . . ." 926 A.2d at 964.

The sentencing court also has the discretion to impose its sentences concurrent or consecutive to other sentences being imposed at the same time. *Commonwealth v. Johnson-Daniels,* 167 A.3d 17, 28 (Pa. Super. 2017). When the court relies on the defendant's prior criminal history and finds that the defendant is a high risk to re-offend and a danger to the public, consecutive standard range sentences are not clearly unreasonable. *See Commonwealth v. Klueber*, 904 A.2d 911, 911 (Pa. 2006).

Finally, when the sentencing court takes into consideration information contained within a pre-sentence investigation report, the Superior Court has noted:

> Since the sentencing court had and considered a presentence report, this fact alone was adequate to support the sentence, and due to the court's explicit reliance on that report, we are required to presume that the court properly weighed the mitigating factors present in the case. . . where the sentencing judge had the benefit of a presentence investigation report, it will be presumed that he or she was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.

*Commonwealth v. Fowler*, 893 A.2d 758, 766 (Pa. Super. 2006).

In the present case, the court relied on all information in the PSI report before imposing sentence, including the character, family history, and rehabilitative needs of Appellant. (N.T.S. at 27). Thus, pursuant to *Fowler*, *supra*, there is a presumption the court was aware of all relevant information regarding Appellant's character and weighed those considerations.

Specifically, the court considered Appellant's age, education, and work history. (N.T.S. at 31-32). As a student Appellant was very intelligent and academically capable but his behavior

fluctuated because he was often times defiant or lazy in the classroom, he was not diagnosed with a learning disability, and he obtained his GED or high school diploma in 2014. *Id*. at 31-32.

The court considered Appellant's mental health history, including his reported diagnosis of ADD and ADHD at the age of seven or eight. (N.T.S. at 28). This was confirmed by a psychological evaluation conducted in 2011 while Appellant was in juvenile court, which also diagnosed Appellant with Oppositional Defiant Disorder because of his non-compliance, verbal aggression, physical aggression, and disrespect towards authority. *Id*. Appellant is currently prescribed depressant medication even though there is no formal diagnosis of depression. *Id*.

The court considered Appellant's reported history of substance abuse. (N.T.S. at 28). Appellant stated he drank alcohol only occasionally, he first tried marijuana at age 15 but stopped at age 17 after being placed on juvenile probation, he completed drug/alcohol counseling as a teenager, and he also completed treatment while in SCI between 2015 and 2018. *Id*.

Juvenile records were reviewed, including a release summary stating that Appellant struggled with anger management in 2012. (N.T.S. at 29). This poor behavior continued into 2013, when Appellant refused to participate in school and disrespected teachers. *Id*. at 30. In 2013, Appellant did successfully transition to a residential program and a discharge summary stated he did a good job complying with the rules and regulations most of the time, although he lacked motivation to find employment and admitted he was lazy. *Id*.

The court considered Appellant's prior criminal record starting as a juvenile. (N.T.S. at 32). Appellant had juvenile adjudications for committing the crimes of disorderly conduct in August 2011, receiving stolen property in November 2011, and felony escape in June 2012. *Id*. Appellant also has an adult conviction in July 2015 for the crime of firearms not to be carried

17

without a license, for which he received a state prison sentence of 1½ to 5 years. *Id.* This is now the fifth time Appellant has appeared in court since 2011 for new criminal charges. *Id.* at 33.

The court considered Appellant's rehabilitative needs, finding there is little to indicate he has made any attempt to change his lifestyle or is amenable to rehabilitation. (N.T.S. at 33). In addition to repeatedly committing new crimes, Appellant violated probation as a juvenile in November 2011 and absconded from juvenile court in March 2012. *Id.* While the court recognized these juvenile records were somewhat remote in time, the records and psychological evaluation were relevant to show that Appellant has been unwilling or unable to accept the help and treatment he has been offered over an extended period of time. *Id.* at 29.

The court considered the nature and circumstances of these crimes. (N.T.S. at 33). Even though Appellant did not pull the trigger of the firearm, he was involved in an armed robbery where his co-defendant shot and almost killed the victim. *Id.* This is now Appellant's second conviction involving a firearm in a little over three years. *Id.* at 33-35.

The court considered the gravity of the offense as it relates to impact on the community and victim. (N.T.S. at 35). Appellant's co-defendant shot and critically injured the victim. *Id.* The victim would have died if not for emergency surgery, he was hospitalized for one week, the bullet is still in his body, and it cannot be removed or he may become paralyzed. *Id.* Further, the victim is at risk for complications the rest of his life, including intestinal blockage. *Id.*

The court considered the penalties authorized for the crimes committed, the guidelines of the Sentencing Code, and those established by the Pennsylvania Sentencing Commission. (N.T.S. at 31). The sentences were within the standard range of the guidelines. *Id.* The court also determined confinement that was consistent with the protection of the public. *Id.* at 35.

18

Finally, the court considered the character and history of Appellant as disclosed in the PSI and during the court proceedings. (N.T.S. at 31). The court also considered the arguments of counsel, letters and comments from Appellant's family members, and comments made by Appellant during the sentencing proceedings. *Id.* at 30.

After considering all factors, the court found a sentence of total confinement was necessary because there was an undue risk that Appellant would commit another crime during a period of probation or partial confinement, and he is in need of correctional treatment that can be provided most effectively by his commitment to an institution. (N.T. at 35-36). Furthermore, Appellant is a danger to society, society needs to be protected, and incarceration was warranted because a lesser sentence would depreciate the seriousness of the crimes. *Id.* at 36.

Because Appellant has failed to show that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision, this claim is without merit.

### CONCLUSION

Based on the foregoing, the trial court did not improperly limit counsel's questioning of a Commonwealth witness or any improper limitation was harmless. Furthermore, the sentence imposed was not an abuse of discretion. Therefore, this appeal should be denied.

BY THE COURT:

Date: ___May 21, 2020___

_____
DONALD R. TOTARO, JUDGE

cc:     Jennifer L. Ponessa, Esquire, Assistant District Attorney
        Daniel C. Bardo, Esquire, Counsel for Appellant

19